**HEAVY DUTY TRUX LIMITED,
Appellant,**

v.

**LABOR AND INDUSTRIAL RELATIONS
COMMISSION,**

**Division of Employment Security,**

**Richard Rowe, Respondents.**

**No. WD 49013.**

Missouri Court of Appeals,
Western District.

Aug. 2, 1994.

**639**

Michael Moroni, Bloomfield, for appellant.

John B. Keller, Jefferson City, for Labor & Industrial Relations Comm'n.

Ronald J. Miller, Jefferson City, for Div. of Employment Security.

Richard Rowe, pro se.

Before FENNER, C.J., P.J., and LOWENSTEIN and SPINDEN, JJ.

FENNER, Chief Judge.

Appellant, Heavy Duty Trux Limited, appeals the order of the Circuit Court of Cole County, Missouri, affirming the determination of the Labor and Industrial Relations Commission (Commission). The Commission, which affirmed the decision of the Appeals Tribunal, found that Richard Rowe (claimant) is not disqualified from receiving unemployment compensation benefits by reason of his voluntary separation from work on January 24, 1993, because that separation was with good cause attributable to the work or the employer.

The record reflects that Richard Rowe was employed by Heavy Duty Trux as an over-the-road truck driver from December 30, 1990 through January 24, 1993. The incident which precipitated claimant's departure from Heavy Duty Trux occurred about a week prior to January 24, 1993. Claimant was making a delivery to Lee's Summit, Missouri,

when the truck and trailer slid off a driveway and into a ditch. Apparently, the driveway was slick due to snow and freezing rain. The dispute concerned money that was deducted from claimant's paycheck to pay for the wrecker service used to pull the truck and trailer out of the ditch.

Rowe filed his initial claim for unemployment benefits on January 27, 1993. In a letter to the Missouri Division of Employment Security (Division), dated February 5, 1993, Melba Duty, corporate secretary and record keeper for Heavy Duty Trux, protested Rowe's application for unemployment benefits because "Mr. Rowe quit his job for no good reason."

On February 23, 1993, a deputy at the Division determined that "the claimant is not disqualified because of the quit on 01/27/93. The claimant quit with good cause attributable to his work or his employer." The deputy found that the claimant quit because the employer withheld $175 from claimant's check to pay for a tow truck service call that claimant made when his trailer slid off a driveway into a ditch. The deputy determined that the trailer slid off "due to icy conditions which were beyond the control of the claimant."

On March 1, 1993, Heavy Duty Trux appealed the deputy's determination to the Appeals Tribunal. In a letter to the Division indicating appellant's desire to appeal, Melba Duty stated that "Mr. Rowe was negligent with his care for equipment entrusted to him[, and] failed to exercise basic good judgement [sic] in handling the equipment and, therefore, he was responsible for the charges imposed as a result." Ms. Duty cited company policy, which claimant had signed, stating, "Due to recent increases in damage and shortages, all loss determined to be due to driver negligence (improper loading and count shortage or equipment damage or abuse) will be deducted from driver pay."

A telephone hearing took place on April 26, 1993, before an Appeals Referee. Claimant, Melba Duty, and Steve Jordan, a dispatcher for Heavy Duty Trux, testified at the hearing. On May 10, 1993, the Appeals Tribunal rendered its decision, modifying the deputy's

determination only as to the date of separation, and finding that "[t]he claimant is not disqualified for benefits by reason of his voluntary separation from work on January 24, 1993, on a finding that that separation from work was with good cause attributable to the work or the employer." The Appeals Referee further stated as follows:

The issue is whether [claimant's] leaving was with good cause attributable to the work or the employer. The claimant left because the employer withheld $175 from his paycheck in order to pay for a wrecker used by him to get the employer's truck and trailer out of the ditch at Lee's Summit. The employer determined that the claimant had been negligent because he slid into the ditch absent any investigation. Furthermore, the employer denied that any prior permission had been obtained before the claimant called the wrecker. The Appeals Tribunal concludes that the employer made no effort to determine whether the claimant had indeed been negligent in sliding into the ditch nor that any other solution would have been appropriate in the circumstances. It was the employer's truck and the employer's trailer and the claimant was about the employer's business and upon the claimant's request the employer sent the money to the claimant at the time of the incident. It was in the best interest of the employer to get the truck and the trailer out of the ditch as soon as possible. There was no allegation of any damage to the truck or the trailer. Under these circumstances the Appeals Tribunal concludes that the claimant acted reasonably and that the employer acted unreasonably in withholding the money from the claimant's paycheck and further that the claimant's voluntary separation from work for that reason was with good cause attributable to the work or the employer.

Appellant filed an application for review by the Commission on May 14, 1993. On June 16, 1993, the Commission entered an order affirming the decision of the Appeals Tribunal and finding it to be supported by competent and substantial evidence on the whole record. The Commission adopted the decision of the Appeals Tribunal as the decision of the Commission.

Appellant filed a Petition for Review of the Commission's decision in the Circuit Court of Cole County, Missouri. In its petition, appellant argued that the Commission's decision is not supported by competent and substantial evidence on the whole record and that claimant should have been disqualified for benefits because he did not have good cause attributable to his work or his employer to leave his work. The trial court affirmed the Commission's decision, and this appeal followed.

In his first point on appeal, appellant argues that the trial court committed reversible error in affirming the Commission's decision because claimant failed to sustain his burden of proving that he had good cause to quit his employment based on appellant's withholding $175 from claimant's paycheck as reimbursement for the wrecker expense.

■ On appeal in unemployment compensation cases, this court reviews the decision of the Commission, not the judgment of the circuit court. *IXL Mfg. Co. v. Labor & Industrial Relations Comm'n*, 679 S.W.2d 903, 904 (Mo.App.1984). The findings of the Commission as to facts, if supported by competent and substantial evidence and in the absence of fraud, are conclusive; judicial review then is confined to questions of law. *Tin Man Enterprises, Inc. v. Labor & Industrial Relations Comm'n*, 866 S.W.2d 147, 148 (Mo.App.1993); § 288.210, RSMo 1986. Where the Commission as trier of fact has reached one of two possible conclusions from the evidence, this court will not reach a contrary conclusion even if such a conclusion might have reasonably been reached. *Tin Man*, 866 S.W.2d at 149. We defer to the Commission's resolution of witness credibility, and consider only those facts and inferences favorable to and consistent with the Commission's decision. *Thurman v. Labor & Industrial Relations Comm'n*, 706 S.W.2d 601, 602 (Mo.App.1986).

■ Section 288.050.1(1), RSMo Supp.

1993,[1] provides as follows:

1. Notwithstanding the other provisions of this law, a claimant shall be disqualified for waiting week credit or benefits until after he has earned wages for work insured under the unemployment compensation laws of any state equal to ten times his weekly benefit amount if the deputy finds:

(1) That he has left his work voluntarily without good cause attributable to his work or to his employer ...

Thus, a worker is denied unemployment benefits if he voluntarily quits his job absent good cause. Whether a claimant has good cause for terminating his employment is a matter of law. *St. John's Regional Medical Center v. Labor & Industrial Relations Comm'n,* 814 S.W.2d 698, 700 (Mo.App.1991). A claimant has the burden of proving good cause. *Tin Man,* 866 S.W.2d at 149.

■ A worker has good cause to terminate employment voluntarily when that conduct conforms to what an average person, who acts with reasonableness and in good faith, would do. *Contractors Supply Co. v. Labor & Industrial Relations Comm'n,* 614 S.W.2d 563, 564 (Mo.App.1981). The reasonable person or worker standard requires that a claimant prove either that his concerns are real or that a reasonable worker would have such concerns. *Tin Man,* 866 S.W.2d at 149.

Voluntary termination of employment must be in good faith. *Id.* at 149. Thus, good faith is an essential element of good cause. *Belle State Bank v. Industrial Comm'n, Div. of Employment Security,* 547 S.W.2d 841, 846 (Mo.App.1977). "To establish good faith the employee must prove an effort was made to resolve the dispute before resorting to the drastic remedy of quitting his or her job." *Tin Man,* 866 S.W.2d at 149.

■ At the hearing before the Appeals Tribunal, on April 26, 1993, claimant testified that he quit his job at Heavy Duty Trux on January 24, 1993 because Heavy Duty Trux owed him $175 and refused to pay him this sum. With regard to the circumstances sur-

rounding the money dispute, claimant testified that he was making a delivery in Lee's Summit about a week before his separation from work. The weather had been snowing and freezing rain. In order to make the delivery, he had to go up a hill on a driveway. As he was driving up the hill in the truck, "the trailer started sliding and it slid in the ditch.... When it started sliding it pulled the truck around to the left." They had to get a wrecker to pull the truck out.

Claimant further testified, in pertinent part, as follows:

Q [Appeals Referee]: Well now wait just a minute. How did your money get involved this [sic]?

A [Rowe]: Well see, Heavy Duty Trux paid for the wrecker. They issued a greenback check to the Pipes Tow Service and then when I got in Jim Duty told me that he was going to hold that out of my check and wasn't going to pay me.

Q: And did he?

A: Yes, he did hold it out of my check. He did not pay me.

Q: Okay. So it was—$175 was the amount?

A: Yes, ma'am.

Q: Were you told why that occurred?

A: Oh, yeah. He—he said it wasn't his policy to—to pay wrecker bills.

Q: What was his policy?

A: Well I think that kind of varies to how it suits him.

Q: Well was there something in writing that was given to anyone?

A: Well they had a deal any abuse to the truck and there was no abuse or—or abuse—or how's that—or damage to the truck and there was no damage to the truck. And there was—was nothing said about a wrecker bill. And, you know, freezing rain and roads them trucks are going to get stuck, they're going to slide in the ditch.

Q: Well what was the policy about abuse or damage to the truck?

\* \* \* \* \* \*

A: It says Heavy Duty Trux something about duty and abuse to the truck, negligent and abuse. And there was no abuse.

Q: Well what is the result if there is abuse or damage?

A: Well that don't—they may be held—it says they may be held accordingly.

Q: The driver is held responsible?

A: Yes.

Q: All right. Had you ever received a copy of this policy?

A: Yes, I had a copy of it when I—well when I—I guess they gave me a copy when I went to work up there 'cause I had to sign a paper, you know. But there was still no damage to the truck.

Q: Was there any damage to the trailer?

A: No, there wasn't.

Q: Okay. Had you started up the hill?

A: Yes. I was going up the hill and—and, like I say, the trailer started sliding to the right 'cause it was a uphill grade and it—it was like I say, it was snow and freezing rain and Interstate 70 had been closed that morning previous and the trailer started sliding and there wasn't nothing I could do 'cause, you know, when it slid it pulled the tractor around to the left, the opposite direction the trailer going.

Q: All right. Was there any other reason for your leaving your employment at that time?

A: No. I'd probably still be there today if they had not did me like that.

Q: Did you ask them to reimburse you?

A: Yes, I did. I talked to Jim probably about 30 minutes in there and then I talked to Terry Woods. He—he called me wanting me to come back to work and I talked to him and I guess he talked to Jim about my money and—

Q: Okay. Who is Jim?

A: He's the owner of the company. Him and Melba owned it.

Q: Okay. What's his corporate position?

A: I guess president.

The company policy to which claimant refers reads, in relevant part, as follows:

Due to recent increases in damage and shortages, all loss determined to be due to driver negligence (improper loading and count shortage or equipment damage or abuse) will be deducted from driver pay.

Thus, according to the policy, it must first be determined that the driver was negligent before the loss will be deducted from driver pay. The record reflects, however, that appellant failed to investigate the incident and therefore could not have determined whether claimant was negligent. In fact, there is nothing in the record to show that claimant was negligent. Furthermore, in the company policy, "all loss" seems to refer to "improper loading and count shortage or equipment damage or abuse." Appellant does not dispute that there was no damage to the truck and trailer. Rather, appellant claims that the "loss" was the money spent on the wrecker service. However, the company policy says nothing about a loss from money spent on a wrecker service.

Melba Duty, corporate secretary and record keeper for Heavy Duty Trux, testified, in pertinent part, as follows:

Q: And why did you deduct $175 for a wrecker bill?

A [Ms. Duty]: Well I don't normally take care of a wrecker bill that is caused due to negligence. And he did not call in and check before he engaged a wrecker and he—all employees are supposed to call in before they spend any money on the truck. And he did—he was aware of this. Whenever he went to work he signed a paper saying that he was aware that if there was a loss due to his negligence, that it would be deducted out of his check. And I do have and did send a copy of that—

\* \* \* \* \* \*

Q: ... Why did you deduct $175 for the wrecker bill is the question I asked.

A: I deducted it because it was not an okayed expenditure on the truck and because this was a loss due to negligence.

\* \* \* \* \* \*

Q: Ms. Duty, was there some investigation made of this accident?

A: Not as—not that I know of.

Q: All right. How did you determine that it was due to the claimant's negligence if there was no investigation done?

A: Well there were other trucks that went in the same day moments before he had his problem and after he had his problem and the company there that he delivered to told me this fact, that they had trucks in and out all morning. We had trucks up there also delivering and none of them got in the ditch. So somebody had a problem somewhere. I would say it would be a problem with his driving or the fact that he did not check the roadway out good enough. If he had have he wouldn't have tried to pull in there at that time.

Q: Well if other trucks were pulling in and out what would have been different about him pulling in and out, Ms. Duty?

A: Well the temperature could have been dropping right then or it could have been sleeting or it could have been doing anything.

Q: Okay.

A: You don't pull onto an incline with a loaded truck without checking the premises out before you go.

Q: Okay. Did the claimant check the premises?

A: Evidently not.

Q: Did you ask him?

A: No.

＊　＊　＊　＊　＊　＊

Q: All right. Was there any damage to the vehicle?

A: No.

According to Ms. Duty, it was a company rule that "you must check in before you spend any of the money on your vehicle" and "if you do do it and you have not gotten permission then you take care of it yourself." Ms. Duty testified that claimant did not call before he got the wrecker and that he had not obtained prior permission to obtain the services of a wrecker. Claimant, however, disputed this and stated that he called the dispatcher for Heavy Duty Trux, Steve Jor-

dan, before he called the wrecker service. According to claimant, Mr. Jordan told claimant to call a wrecker service and said that he would issue a check when the truck got pulled out of the ditch. Claimant testified that he called Heavy Duty Trux "within four minutes after the trailer slid off in the ditch, immediately."

Steve Jordan, the company dispatcher, testified that there was no investigation made of the incident and that he was not aware of any investigation by the authorities. Mr. Jordan further testified as follows:

Q: All right. Did you discuss the calling of the wrecker with the claimant?

A [Mr. Jordan]: No, I did not.

Q: Did you receive notice that there had been an accident or an incident involving the claimant?

A: Yes, ma'am. He called me and told me that he had pulled the, you know, pulled the trailer off through the ditch and—

Q: So you did discuss the incident.

A: After it happened, yes.

Q: After what happened?

A: I mean aft—well I guess what I'm trying to say is he called me when he was into the place. He was pulling into their—to their facility and he called me and told me he'd run it off in a ditch. I had talked to him once earlier that morning but he was—he wasn't in a ditch at that time.

Q: Okay. What did he tell you about this incident?

A: Well he just told me he had pulled a trailer off in a ditch—

Q: And did he tell you—

A: —that he missed the driveway.

Q: Oh, he missed the driveway.

A: Uh-huh.

Q: Okay. Did he tell you how that happened?

A: Well he told me there was snow on the ground and he couldn't see, the ditch was snowed full.

＊　＊　＊　＊　＊　＊

Q: Okay. And what did you say to him at this point?

A: Well he told me he already had a wrecker coming and that's—that's about all that was said about it.

Q: Did you tell him to cancel it?

A: Did I tell him to cancel it, no.

Q: Was there any discussion about how the wrecker was going to be paid?

A: No, ma'am.

Q: Okay. Were you further involved in this matter at all?

A: I give him the money to get the wrecker out of the ditch. I think I'm the one that give him the MPS greenback for that.

$$* \quad * \quad * \quad * \quad * \quad *$$

Q: Are they expected to reimburse that?

A: When it's negligence, yes.

Q: I see. And what is negligence according to the employer's definition?

A: Well something that could have been prevented.

Q: And who decides what is and is not negligence?

A: Well that's Jim and Melba Duty.

Q: Okay. Based upon what information?

A: Well on the information that we can gather without, you know, without actually having to go look at every little thing, you know. I—I mean we can't—every time something happens we can't just jump up and—and go to, you know, go to a scene with just, you know, with no notice on it or whatever.

The record reflects that Heavy Duty Trux failed to investigate the incident in order to be able to determine whether claimant was negligent. The Commission was free to believe claimant's testimony that he called Heavy Duty Trux immediately after the truck slid into the ditch and received permission to call a wrecker service; likewise, the Commission was free to disbelieve the testimony of Ms. Duty and Mr. Jordan in that regard.

Claimant's testimony demonstrates that he acted in good faith when he tried to resolve the money dispute by talking with Jim Duty, president of Heavy Duty Trux, for thirty minutes. When the company took $175 out of claimant's paycheck and refused to give him that money back, claimant acted reason-ably in quitting his job. Claimant's action of quitting his job was in response to appellant's unreasonable actions, i.e., determining that claimant was negligent without any investigation of the incident and without any proof of negligence, asserting that claimant failed to call and obtain permission for the wrecker when the record reveals otherwise, and deducting the money from claimant's paycheck when the record reveals no negligence on claimant's part and, further, no damage to the company's equipment.

There was competent and substantial evidence in the record from which the Commission could find that claimant left his job with good cause attributable to his work or to his employer.

Appellant's first point is denied.

■■■ In its second and third points on appeal, appellant argues that the trial court committed reversible error in affirming the Commission's order because (1) there is no evidence in the record that claimant was unemployed and that claimant was available for work and actively seeking work, such findings being prerequisite to the payment of benefits; and (2) claimant failed to sustain his burden of proving that he had applied for available suitable work and, further, claimant failed to accept suitable work offered to him by appellant.

As to both of appellant's arguments, respondents correctly point out that appellant has misinterpreted the unemployment claim process and what has been determined in this particular case. In this case, the Commission, adopting the decision of the Appeals Tribunal, determined only that claimant was not disqualified for unemployment benefits because his voluntary separation from work was with good cause attributable to his work or his employer. Claimant was not awarded benefits or even determined to be eligible for benefits.

In *Chemtech Industries, Inc. v. Labor & Industrial Relations Comm'n*, 617 S.W.2d 121, 125 (Mo.App.1981), appellant, Chemtech Industries, Inc. (Chemtech), in one of its points relied on argued that "The Trial Court Erred in Failing to Find That the Strikers

Were Not Available for Work Within the Meaning of Section 288.040–1(2), R.S.Mo. 1969 (sic)." In *Chemtech,* the deputy determined that claimants were not eligible for unemployment benefits because there had been a work stoppage as a result of a labor dispute. *Id.* The deputy did not make a finding as to whether the claimants would otherwise be eligible for benefits under section 288.040.1(2), which provides:

1. A claimant who is unemployed and has been determined to be an insured worker shall be eligible for benefits for any week only if the deputy finds that:

\* \* \* \* \* \*

(2) He is able to work and is available for work. No person shall be deemed available for work unless he has been and is actively and earnestly seeking work ...

The court in *Chemtech* stated, "Upon review of the deputy's determination by the Appeals Tribunal the referee considered only the issue determined by the deputy and specifically rejected the issue of the eligibility of the claimants under § 288.040.1(2) ... because the issue was not before him." *Id.* The court found that the Appeals Tribunal's decision that claimants were not ineligible for benefits by reason of section 288.040.5(1) was not a finding that they were eligible for benefits. *Id.*

The court in *Chemtech* stated as follows:

At this point in the proceeding if claimants were able to work and available for work, benefits would be payable during the pendency of the review process for the weeks in which they were eligible in accordance with the provisions of § 288.070.5 ... and § 288.210.... It was incumbent upon the deputy to make the determination as to whether they were eligible for benefits in accordance with § 288.040....

The determination of the deputy in that regard would be appealable to the Appeals Tribunal. It is apparent that the statute requires a determination of eligibility of claimants which includes ability to work and availability before that issue can be reviewed under the appellate procedures.

\* \* \* \* \* \*

The circuit court does not try the case de novo and is restricted to a review of the issues determined by the Commission.

Only the deputy can make the determination of eligibility in the first instance. That finding may be appealed to the Appeals Tribunal for its decision on the evidence before it.

We cannot tell from the present record whether the deputy determined that the claimants were eligible for benefits. If the deputy made such a determination Chemtech's remedy was to appeal from that determination. It could not have the issue tried by the circuit court.

*Id.* at 125–26.

The court in *Chemtech* concluded that the trial court did not err in failing to make findings regarding claimants' eligibility in accordance with section 288.040.1(2). *Id.* at 126.

Respondents correctly note in their brief that "[t]he [unemployment claim] process is a series of filings by the claimant; a series of opportunities for the employer to protest; and a series of examinations and determinations by the Division over the course of the 'benefit year.'"

Under section 288.070.2, a deputy of the Division promptly examines the initial claim and makes a monetary determination on the claimant's status as an insured worker. The deputy then must promptly notify the claimant in writing of his determination on an initial claim. § 288.070.3. The deputy must also mail notice of the initial claim filed by an insured worker to each base period employer of such individual and to the last employer. § 288.070.1. After receiving notice of the initial claim, any such employer may file a written protest against the allowance of benefits. § 288.070.1.

Section 288.040.1 provides, in pertinent part, as follows:

1. A claimant who is unemployed and has been determined to be an insured worker shall be eligible for benefits for any week only if the deputy finds that:

\* \* \* \* \* \*

(2) He is able to work and is available for work. No person shall be deemed available for work unless he has been and is actively and earnestly seeking work. Upon the filing of an initial or renewed claim, and prior to the filing of each weekly claim thereafter, the deputy shall notify each claimant of the number of work search contact(s) required to constitute an active search for work. . . .

Under section 288.040.1(2), each weekly claim for benefits must be examined to determine if a claimant is eligible for benefits for the week claimed. Thus, eligibility must be determined on a weekly basis. If the deputy determines that a claimant is ineligible for benefits for a particular week, the claimant can appeal that determination. *See* § 288.-070. Similarly, the employer can appeal the deputy's determination as to benefits eligibility. *See* § 288.070.

As noted above, respondents correctly state in their brief that "claiming unemployment benefits is a series of filings, examinations and determinations. In addition, there is a potential for an employer protest and litigation at each step of the process. The relevant issues to be decided in any particular litigation will depend upon where you are in the process."

In the case at bar, claimant filed an initial claim and was found to be an insured worker. Notice of the initial claim was mailed to Heavy Duty Trux. Heavy Duty Trux filed a protest to the initial claim "based on the fact that Mr. Rowe quit his job for no good reason." The hearing concerned only issues raised by the employer's protest to the notice of initial claim. At this point in the process, there had not yet been any weekly claim for benefits filed and, therefore, there could not be any determination as to eligibility for benefits since this determination can only be made after a claimant files a claim for benefits.

The deputy determined in the case at bar only that "the claimant is not disqualified because of the quit on 01/27/93. The claimant quit with good cause attributable to his work or employer." There was no determination as to eligibility for benefits under section 288.040 because this occurs later in the process. Thus, the only issue under review is whether claimant is disqualified from receiving unemployment benefits by reason of his quitting his employment at Heavy Duty Trux. The Commission determined that claimant had good cause to quit his employment and is not disqualified from receiving unemployment benefits.

The issue raised in appellant's point 2, eligibility for benefits, will be examined later in the process when claimant files his weekly claim for benefits. The issue raised in appellant's point 3, failure to apply for or accept suitable work, was not before the Commission and was not decided by the Commission. In accordance with the statutory scheme which sets forth the unemployment claim process and the court's decision in *Chemtech,* we find that the Commission's decision is supported by the record and is in accordance with the law.

The judgment of the trial court affirming the Commission's decision is affirmed.

All concur.