June RENO, Appellant,

v.

TYSON POULTRY, INC., Defendant,

Division of Employment Security, Respondent.

No. WD 66444.

Missouri Court of Appeals, Western District.

Oct. 31, 2006.

Richard Paul Beard, Sedalia, for Appellant.

Cynthia Ann Quetsch, Jefferson City, for Respondent.

Before JAMES M. SMART, JR., P.J., EDWIN H. SMITH, and LISA WHITE HARDWICK, JJ.

JAMES M. SMART, JR., Judge.

June Reno appeals the decision of the Labor & Industrial Relations Commission finding her disqualified for waiting week credit and benefits on the basis that Ms. Reno voluntarily left her employment without good cause. She contends that the decision was not supported by the competent and substantial evidence on the whole record. We agree with the Commission that the claimant did not demonstrate that her physician had restricted her to forty hours of work per week, and that she did not demonstrate that any restrictions constituted "good cause" for her voluntary separation from employment. But because our study of the record shows that the Commission erred in a factual determination related to the "good cause" issue, and because the record does not clarify facts that might have been pertinent to that analysis, we conclude that the decision must be vacated and remanded for further proceedings.

## Factual Background

Claimant Ms. Reno began working for Tyson Poultry, Inc., in June 2003.[1] She was assigned work in 2003 in the position of "USDA Inspector Helper." In that position, she engaged in repetitive motions handling poultry, assisting inspectors. In December 2003, while "hanging birds back

---

1. The medical records suggest that Ms. Reno had a previous period of employment with Tyson in the 1990's, when she worked in the "evisceration section." She was treated for pain in the left extremities at that time. She also had carpal tunnel releases performed. She apparently was hired again in 2003 as a USDA inspector helper.

over [her] head," the 49–year–old worker suffered an injury to her left hand, elbow, and shoulder. The injury, which was compensable under the workers' compensation law, included some degree of permanent impairment.

During the time Ms. Reno was undergoing treatment for the injury, the company assigned her to the laundry operation in a "made-up" job in order to accommodate the temporary restrictions the physician gave her. She was helping "at the [laundry] window to give out supplies to team members." At other times, the company would also assign her to the "evisceration room," where she did paperwork. She generally worked less than 40 hours per week during this period.

By mid-April 2005, the HR office understood that the recovery period was ended and that it was time to move Ms. Reno to a permanent position that corresponded to any permanent restrictions she had. Ms. Reno testified that the subject of the new position first came up about the middle of April, about a week before the meeting at which she was suspended. She testified that a nurse and a management officer told her that the "spreader" position in "cut-up" (also sometimes referred to as "fully cooked") was a possibility. They also mentioned the possibility of another position. They said, however, that they would do further investigation with the doctor because no one understood the restrictions. Ms. Reno also said that one of the nurses told her that a permanent position in the laundry room might be a possibility.

On April 22, Ms. Reno was called to a meeting with the Production Manager, a nurse, and the Human Resources Supervisor, Mr. Ginnett. The nurse had determined that a position that would match Ms. Reno's restrictions was the "spreader" position. According to Mr. Ginnett, that position was offered to Ms. Reno, but Ms. Reno declined because she did not want to work six days a week. Mr. Ginnett testified that he and the Production Manager then brought Ms. Reno to the HR office to explain to her "the consequences" of refusing to do the job (meaning that Tyson could discharge her). When she did not accept the position offered, they asked her to write out a statement of why she did not want to accept the position. She wrote out a statement to the effect that she "did not feel" she could perform work "six nights a week or more." The two company officers then suspended her until April 27. When she came back on April 27, her stance had not changed. The company terminated her.

The company nurse testified that the restrictions provided by the doctor for Ms. Reno did not restrict her to working 40 hours a week, although the restrictions (which related to physical movement, torque, lifting, etc.) were extensive.

Ms. Reno stated she would not accept the spreader position, which, she said, was a six-day-a-week job, and, in the fall of the year toward the holiday season, expanded to seven days a week. She said the management staff stated to her that the position only "occasionally" involved six or more days a week. Ms. Reno did not accept that characterization of the job requirements. She declined the job because she did not believe she could work six or seven days per week. According to Mr. Ginnett, Ms. Reno did not say during the meeting that the doctor had restricted her to forty hours. She simply expressed that she did not believe she could work more than five days per week.

On appeal, she contends that she was terminated; but in the event this court views her separation as voluntary, she contends that she had "good cause" related to her employment for declining the position

she was offered. Thus, she contends that the Commission erroneously denied her benefits.

## Standard of Review

Article V, Section 18 provides for judicial review of the Commission's decision:

All final decisions, findings, rules and orders on any administrative officer or body existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights, shall be subject to direct review by the courts as provided by law; and such review shall include the determination whether the same are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record....

In *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222 (Mo. banc 2003), the Court, after noting the constitutional directive, found the statutory standards in Section 287.495 to be in harmony with the constitutional standard. The court went on to state:

A court must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, *i.e.,* whether the award is contrary to the overwhelming weight of the evidence. Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record. An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence.

The Court in *Hampton* also made clear that judicial review is to be conducted objectively, *without* viewing "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award." *Id.* at 222–23. The Court speci-

fied that the examination of the record is a one-step process of determining whether "considering the whole record, there is sufficient competent and substantial evidence to support the award." *Id.* at 223. This standard would not be met "in the rare case when the award is contrary to the overwhelming weight of the evidence." *Id.*

■ Review of the Commission's decision under the Employment Security Law is the same as review of a decision under the Workers' Compensation Law. *CNW Foods, Inc. v. Davidson,* 141 S.W.3d 100, 103 (Mo.App.2004). The Constitutional provision is the same, and the two statutes (287.495.1 and 288.210) in the respective chapters are "virtually identical." *Id.* Therefore, as in Workers' Compensation cases, we look to the whole record in reviewing the Board's decision, not merely at the evidence that supports its decision. *Id.* We view the evidence objectively, not in the light most favorable to the decision of the Commission.

## Voluntary Separation

In this case, Ms. Reno declined to work in a position that the company determined would fit her restrictions. There is no evidence that the physician restricted Ms. Reno to 40 hours (although he, according to Ms. Reno, "recommended" that she work only 40 hours). There is also no evidence that at the April 22 meeting or thereafter, Ms. Reno presented any information to the employer to verify that she was restricted to 40 hours. Thus, although her employer informed her she was terminated, that characterization does not bind our review. We review the matter as a voluntary separation from employment. *See Missouri Div. Of Employment Sec. v. Labor and Ind. Rel. Comm'n of Mo.,* 651 S.W.2d 145, 149 (Mo. banc 1983).

■ Because the separation is viewed as voluntary, the claimant, Ms. Reno bears the burden of proving that her voluntary separation resulted from good cause attributable to her work or her employer. *See* § 288.050.1(1). "Good cause," according to the courts, has "no fixed or precise meaning, and is judged by the facts of each case." *Sokol v. Labor & Indus. Relations Comm'n,* 946 S.W.2d 20, 24 (Mo.App. 1997). The phrase has been interpreted to mean "cause that would motivate the average able-bodied and qualified worker in a similar situation to terminate his or her employment." *Hessler v. Labor & Indus. Relations Comm'n,* 851 S.W.2d 516, 518 (Mo. banc 1993). The "good cause" necessary to support the award of unemployment benefits when an employee voluntarily quits must be cause attributable to her work or her employment. § 288.050.1. The conditions that motivate an employee to voluntarily leave "must be real, not imaginary, substantial, not trifling, and reasonable, not whimsical, and good faith is an essential element." *Hessler,* 851 S.W.2d at 518. Mere dissatisfaction with working conditions does not constitute good cause for quitting employment unless the dissatisfaction is based on a substantial change in wages or working conditions from those in force at the time the claimant's employment commenced. *Cooper v. Hy-Vee, Inc.,* 31 S.W.3d 497, 504 (Mo.App.2000) (*citing Van Drie v. Performance Contracting,* 992 S.W.2d 369, 373 (Mo.App.1999)). Whether the employee's action was reasonable depends upon whether the employee can show that his concerns are real or that any reasonable worker would have had these concerns. *Heavy Duty Trux, Ltd. v. Labor & Indus. Relations Comm'n,* 880 S.W.2d 637, 641 (Mo.App.1994).

The issue that the claimant raised in the interview concerning the proposed new position was related to the fact that the spreader job allegedly involved six or more days per week. Before the appeals referee, she asserted that the doctor had recommended she not work over forty hours. Before the Commission, and now on appeal, she continues to rest her position on the notion that she was restricted by the doctor to five days (40 hours) per week. Oddly, however, it was her original position (that the job involved six or more days a week) that *is* supported in the record, while the Commission's findings concerning the job requirements are not.

### The Commission's Findings

The appeals referee and the Commission are to adopt findings of fact and conclusions of law accompanied by reference to the operative findings of fact. See 8 C.S.R. 10–5.050. The Commission found, *inter alia,* that (1) Ms. Reno refused the position because she understood the position required a minimum of 48 hours per week; and (2) although the spreader position occasionally required 48 to 56 hours per week, the spreader position usually required 40.

■ Ms. Reno testified that, at the interview, she was *told* that the job ordinarily involved only 40 hours. However, no one testified at the hearing that the job involved only 40 hours. At the hearing, Mr. Ginnett, the HR supervisor, was the only witness other than Ms. Reno to address the requirements applicable to the spreader job. Ginnett testified as follows in response to the referee's questions:

Q. The job offer that was made to Ms. Reno on—on the cut-up spreader position, did it require working more than 40 hours per week?

A. Require, the average working time for that department is usually six days a week but not always.

Q. All right, I'm asking how many hours.

A. Forty-eight, usually, but not required. And I might add that if someone has permanent restrictions that cannot allow them to go over 40 hours we would not require that person to come to work more than 40 hours.

Mr. Ginnett's answers are confusing. The question asked how many hours per week were *required.* His first answer seems to suggest that six days (48 hours) is usually required. When pressed for clarification as to how many hours are required, he retreats to "forty-eight *usually, but not required.*" One wonders what Ginnett meant by "forty-eight *usually, but not required.*" Did he mean that Ms. Reno could have chosen to work only five days while others were working six or more? If that is true, why did he not just answer that only 40 hours were required? Or was he simply saying that if there were restrictions in place, the company would abide by the restrictions? The apparent essence of his answer *in light of the question* could be understood as stating contradictory: "Forty-eight hours *are* required, but *are not* required." Neither Ginnett nor anyone else *ever stated* that the job ordinarily involved or required 40 hours. No one so testified. Ms. Reno asserted, and clearly believed, that what she was told at the meeting was wrong. She maintains that the job was a six-day, and occasionally a seven-day, position; and that is the reason she gave in her written statement as to why she declined the position. As mentioned earlier, our review of the evidence is conducted objectively; we do not draw inferences therefrom in the light most favorable to the award. *Hampton,* 121 S.W.3d at 222–23. We do not see how, viewing the record objectively, we can agree with the finding that the record shows that Ms. Reno was offered a position that *ordinarily* required 40 hours per week.

The Commission, after commenting on Ms. Reno's failure to accept the position that accorded with her restrictions, then stated as follows:

Moreover, the claimant failed to make a good faith effort to clarify the hours required in the new position and the hours to which she was restricted. The record lacks substantial and competent evidence of good cause for leaving work voluntarily.

Because the evidence does not show that Ms. Reno's understanding of the hours was incorrect, the record fails to support the conclusion that Ms. Reno breached any duty to "clarify the hours required" in the new position. For all that we can tell from the record, her understanding of the hours was entirely accurate. Rather, for the sake of our review, as well as for the sake of allowing the Commission to do its job, it would have been helpful if there were clarification of Ginnett's unusual and confusing answers to the questions about the hours required. The Commission could have taken steps at that time to clarify the facts had it been alerted to the record discrepancy. While we do not see that the Commission erred in its view of the issue concerning the *physician restrictions,* the record leaves us unsatisfied that the Commission knew everything it needed to know about whether Ms. Reno otherwise had "good cause" to reject the spreader job offered her.

The employment security statute does not specify the party having the burden of developing facts and proving the matter at issue. As a matter of common sense and ordinary procedure, our courts have placed on the claimant the burden of demonstrating "good cause." *See Haynes v. Unemployment Compensation Comm'n,* 353 Mo. 540, 183 S.W.2d 77, 80 (1944). We continue to regard the burden as belonging to the claimant. *See, e.g., Sokol v. Labor &*

*Indus. Relations Comm'n,* 946 S.W.2d 20, 23 (Mo.App.1997). At the same time, while the burden remains on the claimant, we look to the agency as well as the parties to help clarify confusion when there is an apparent lack of pertinent information. *See Smith v. Labor and Indus. Rel. Comm'n of Mo.,* 656 S.W.2d 812, 817–19 (Mo.App.1983). When the Commission resolves the claim, it does not merely decide whether the claimant prevails. It also adopts findings of fact and conclusions of law as to the relevant issues. 8 C.S.R. 10–5.050. Having a sufficiently clear record allows an appropriate adoption of factual findings and conclusions of law in light of the statutory purposes. *Id.* It also allows an appropriate judicial review.

The claimant failed to point out the obvious discrepancy in the record both in the review proceeding and on appeal. In *Smith, supra,* the appellant complained to the reviewing court of a similar lack of factual development, and asked for a remand. 656 S.W.2d at 816. Here, in contrast, there is no request for a remand as to the factual issue related to the hours of employment. We point out the record discrepancy *sua sponte,* because the Commission's factual finding about the job requirement being only forty hours is wholly unsupported in the record. It is impossible to ignore the discrepancy in view of the fact that the real reason the claimant declined the job was that she did not want to try to work more than five days per week (she did not even mention the doctor's restrictions when she wrote out her reason for declining the job). We are not comfortable affirming on this record, with-

out a clarifying remand, because of a concern that to do so may defeat the statutory purposes as to this claim.

The claimant stated she declined the position because the only position offered her involved more than five nights per week—not just *occasionally* or *temporarily,* but *ordinarily.* The record shows that when the claimant was hired in 2003, she was hired as an USDA inspector helper. She was an hourly employee. She was presumably working, as a general rule, not more than five days per week. The new permanent position, however, according to an objective view of Mr. Ginnett's opaque testimony, apparently required six days per week, 48 hours. We simply cannot be comfortable that we are making a proper review of the matter without a remand for clarification, because the record does not support the findings of the Commission.

We will vacate and remand for the Commission to clarify the evidence so as to determine whether claimant's refusal of the offer was objectively reasonable and was based on such a substantial matter as to amount to "good cause" within section 288.050.1.[2]

**Conclusion**

Ms. Reno failed to show "good cause" to the degree that she sought to show that there were *physician restrictions* that justified her decision to decline the position. However, the record suggests another potential issue of good cause. Although Ms. Reno failed to argue that a substantial change in working conditions gave her "good cause" for declining the position, the

2. This opinion resolves the issues related to physician restrictions, which should not be revisited. However, the Commission should, *inter alia,* revisit the required spreader work schedule to clarify the facts. The "good cause" inquiry is a fact specific inquiry, and requires an objective determination. *See*

*Belle State Bank v. Indus. Comm. Div. of Emp. Sec.,* 547 S.W.2d 841, 846 (Mo.App.1977). Mere dissatisfaction with working conditions does not constitute "good cause." *See Cooper v. Hy-Vee, Inc.,* 31 S.W.3d 497, 504 (Mo.App. 2000).

findings and the conclusion of the Commission in regard to the hours of employment in the new job are not supported by the record. For that reason, in accordance with the rationale of *Smith, supra,* we vacate the decision of the Commission and remand the case for clarification of the evidence and for a determination of that "good cause" issue in light of the evidence as clarified.

SMITH and HARDWICK, JJ., concur.