Thomas J. CLARK, Appellant,

v.

LABOR & INDUSTRIAL RELATIONS
COMMISSION, and Eagle Mill,
Inc., et al., Respondents.

No. WD 48586.

Missouri Court of Appeals,
Western District.

May 10, 1994.

Andrew Jay Gelbach, Warrensburg, for appellant.

James Crenshaw, Jefferson City, Sharon Ann Willis, Kansas City, for respondent Labor & Indus. Relations Com'n.

Troy L. Daugherty, Kansas City, for respondent Eagle Mill, Inc.

Before TURNAGE, P.J., and FENNER and SPINDEN, JJ.

FENNER, Judge.

Appellant, Thomas J. Clark, appeals the decision of the Circuit Court of Johnson County, Missouri, granting the Motion for Summary Judgment filed by respondents, Eagle Mill, Inc. and Rollie Jenkins and Donna Jenkins, f/d/b/a Eagle Mill and Elevator Company (hereinafter collectively referred to as Eagle Mill).[1] The trial court found that the decision of the Labor and Industrial Re-

lations Commission (Commission), denying Clark unemployment benefits, was based on competent and substantial evidence and was in accordance with the law. In the underlying action, Clark sought unemployment benefits after leaving his employment with Eagle Mill. This request was denied because it was found that Clark voluntarily left his work without good cause attributable to his work or to his employer. § 288.050.1(1), RSMo Supp.1993.[2]

Clark allegedly sustained an on-the-job injury on November 8, 1991, when he slipped and fell on ice while working at Eagle Mill. Eagle Mill, however, denies that Clark was injured as he alleged. Clark's last day working at Eagle Mill was on November 25, 1991.

Clark sought benefits, effective February 2, 1992, under the Missouri Employment Security Law. A deputy determined that Clark was disqualified for benefits because he voluntarily left his work on that date without good cause attributable to his work or to his employer. Clark appealed the deputy's determination. The Appeals Tribunal heard Clark's appeal at a hearing on April 22, 1992. Clark and Rollie Jenkins testified at the hearing.

On May 4, 1992, the Appeals Referee denied Clark unemployment benefits under the Missouri Employment Security Law, finding as follows:

> By failing to keep the employer informed of his whereabouts and his prospects for returning to work on at least a weekly basis (or other frequency as specified by the employer had there been communication between the parties), the claimant demonstrated his intention to give up his employment. The claimant did not tell the employer why he was leaving his job and failed to make a good faith effort to retain his employment by giving the employer an opportunity to correct the conditions intolerable to the claimant. A good faith effort to retain his employment was essential to establishing good cause for leaving work to

---

1. Eagle Mill and Elevator Company was incorporated effective October 30, 1991, and was thereafter referred to as Eagle Mill, Inc. Rollie Jenkins is president of Eagle Mill, Inc.

2. All references to section 288.050 are to RSMo Supp.1993.

receive unemployment insurance benefits, and it is found the claimant voluntarily left his work effective January 31, 1992, without good cause attributable to his work or to the employer.

Clark appealed the decision of the Appeals Tribunal to the Labor and Industrial Relations Commission. On September 17, 1992, the Commission entered an order affirming and adopting the decision of the Appeals Tribunal.

Clark filed a Petition for Judicial Review in the Circuit Court of Johnson County, Missouri, on September 28, 1992, requesting review of the Commission's order. In his petition, Clark asserted that he did not voluntarily or otherwise quit his employment at Eagle Mill and that he had "good cause and reason" in not returning to work because of on-the-job injuries and the fact that his employer did not carry workers' compensation insurance. Clark asked the court to reverse the Commission's decision.

On July 13, 1993, Eagle Mill filed a Motion for Judgment on the Pleadings or, alternatively, Motion for Summary Judgment. In its motion, Eagle Mill argued that there was substantial and competent evidence before the Appeals Referee and Commission from which to find that Clark left his work or quit his job effective January 31, 1992. Eagle Mill contended that Clark's testimony at the hearing in April of 1992 made it clear that he was able to go back to work after his surgery but was not willing to do so and, thus, had effectively abandoned or quit his job. Furthermore, Clark failed to communicate with his employer his intentions, and his employer could not contact him because he had an unlisted telephone number. After not hearing from Clark for over two months, Mr. Jenkins felt that Clark had abandoned his job.

Eagle Mill further argued in its Motion for Summary Judgment that its failure to maintain workers' compensation insurance did not justify Clark's abandonment of his job. Moreover, Eagle Mill denied that Clark's injury was work-related and that Eagle Mill was ever notified of Clark's injury. Eagle Mill contended that it was never given the opportunity to make suitable arrangements for Clark because Clark failed to communicate his intentions.

The trial court entered judgment on October 15, 1993, granting Eagle Mill's Motion for Summary Judgment and finding that the Commission's decision was based on competent and substantial evidence and was in accordance with the law "because the administrative transcript clearly shows that [Clark] voluntarily left his work without good cause attributable to his work or to his employer." Thus, the trial court affirmed the Commission's decision. This appeal followed.

In his first point on appeal, Clark argues that the Commission's and trial court's findings are erroneous and contrary to law and not supported by competent and substantial evidence because Clark had "good cause" for leaving his job for the following reasons: (1) his employer, contrary to Missouri law, failed to carry workers' compensation insurance; and (2) his employer never advised him that the workers' compensation insurance violation had been rectified and/or that the employer would be responsible for Clark's medical expenses and lost time from work.

As correctly pointed out by respondent Eagle Mill, we note that the issue in this appeal does not focus on the employer's failure to carry workers' compensation insurance; rather, the issue is whether Clark acted in good faith and had good cause to leave his employment within the meaning of section 288.050.1(1).

On appeal in unemployment compensation cases, this court reviews the decision of the Commission, not the judgment of the circuit court. *IXL Mfg. Co. v. Labor & Industrial Relations Comm'n*, 679 S.W.2d 903, 904 (Mo.App.1984). The findings of the Commission as to facts, if supported by competent and substantial evidence and in the absence of fraud, are conclusive; judicial review then is confined to questions of law. *Tin Man Enterprises, Inc. v. Labor & Industrial Relations Comm'n*, 866 S.W.2d 147, 148 (Mo.App.1993); § 288.210, RSMo 1986. Where the Commission as trier of fact has reached one of two possible conclusions from the evidence, this court will not reach a contrary conclusion even if such a conclusion

might have reasonably been reached. *Tin Man*, 866 S.W.2d at 149. We defer to the Commission's resolution of witness credibility, and consider only those facts and inferences favorable to and consistent with the Commission's decision. *Thurman v. Labor & Industrial Relations Comm'n*, 706 S.W.2d 601, 602 (Mo.App.1986).

▓▓▓ Section 288.050.1(1) provides as follows:

1. Notwithstanding the other provisions of this law, a claimant shall be disqualified for waiting week credit or benefits until after he has earned wages for work insured under the unemployment compensation laws of any state equal to ten times his weekly benefit amount if the deputy finds:

(1) That he has left his work voluntarily without good cause attributable to his work or to his employer ...

Thus, a worker is denied unemployment benefits if he voluntarily quits his job absent good cause. A claimant has the burden of proving good cause. *Tin Man*, 866 S.W.2d at 149. Whether a claimant had good cause for terminating his employment is a matter of law. *St. John's Regional Medical Center v. Labor & Industrial Relations Comm'n*, 814 S.W.2d 698, 700 (Mo.App.1991).

▓▓▓ Good cause is a standard of reason applied to the average person, not to the supersensitive. *Tin Man*, 866 S.W.2d at 149. Voluntary termination of employment must be in good faith. *Id.*, at 149. A worker has good cause to terminate employment voluntarily when that conduct conforms to what an average person, who acts with reasonableness and in good faith, would do. *Contractors Supply Co. v. Labor & Industrial Relations Comm'n*, 614 S.W.2d 563, 564 (Mo.App. 1981). Thus, good faith is an essential element of good cause. *Belle State Bank v. Industrial Comm'n, Div. of Employment Security*, 547 S.W.2d 841, 846 (Mo.App.1977).

▓▓▓ "To establish good faith the employee must prove an effort was made to resolve the dispute before resorting to the drastic remedy of quitting his or her job." *Tin Man*, 866 S.W.2d at 149. This is consistent with the purpose behind the Missouri Employment Security Law which is to provide monetary relief for persons *unemployed through no fault of their own. Division of Employment Security v. Labor & Industrial Relations Comm'n*, 625 S.W.2d 882, 884 (Mo.App.1981); § 288.020.1, RSMo 1986. For example, when an employee never speaks to management about a work grievance and instead quits "in disgust," that precipitate conduct is unreasonable and manifests a lack of good faith to consult with the employer to resolve the grievance. *Contractors Supply Co.*, 614 S.W.2d at 565.

▓▓▓ "Good cause" has been said to be "limited to instances where the unemployment is caused by external pressures so compelling that a reasonably prudent person would be justified in giving up employment." *Division of Employment Security*, 625 S.W.2d at 884 (quoting *Citizens Bank of Shelbyville v. Industrial Comm'n*, 428 S.W.2d 895, 899 (Mo.App.1968)). Furthermore, the claimant must act consistently with a genuine desire to work and be self supporting. *Id.*

▓▓▓ At the hearing before the Appeals Tribunal in the case at bar, Clark testified that he thought he last worked on November 22, 1991. He did not work after that date because he suffered an inguinal hernia allegedly from a fall in the parking lot at work on November 8, 1991. In his testimony, Clark stated, "The reason I had to leave work was for the—to get better and get operated on, and when I got better, I still found out that Mr. Jenkins was still not carrying any [workers' compensation] insurance which means my doctor told me if you go up there and get hurt first day back on the job, you're just twice that much further down the road with no compensation. I have had no compensation for the surgery, for no bills or anything. They're still unpaid, and I don't know how I'm even—even going to resolve this situation." The record reflects that Clark went to see a doctor the day after his alleged injury, on November 9, 1991, and had surgery to repair his hernia on December 9, 1991. Around the time of his hernia operation, Clark found out that Eagle Mill had dropped

its workers' compensation coverage.[3] During Clark's testimony, the following colloquy occurred:

Q [Appeals Referee]: At some point, did the doctor tell you that you were okay to return to work?

A [Clark]: Well, he told me that I was eligible to go to work, he said, but I would not go to work up there because it will still be lifting heavy—

\* \* \* \* \* \*

Q: Mr. Clark, please just answer my questions.

A: Oh, I'm sorry.

Q: The answer is, yes, the doctor did.

A: Yeah, he said—

Q: When did he do that?

A: About the first of February or so. I went—I think the 2nd or something like that. I went down the next day and filed for unemployment.

\* \* \* \* \* \*

Q: If you didn't quit the job, how do you describe your status now?

A: Well,—

Q: Are you still employed with Mr. Jenkins?

A: No, I don't feel that I'm—

Q: Did he fire you?

A: I imagine he did, because I—it's the only thing I—

Q: Sir, you can't imagine that he did.

A: Well, okay, let's say that he—

Q: Did he tell you that you were fired?

A: No, he did not—

Q: Did he tell you—

A: —tell me I was fired.

Q: —that you couldn't come to work there anymore?

A: No.

Q: Did you elect not to go to work there anymore?

A: On my own, yes, and through the advice of an attorney and the doctor.

\* \* \* \* \* \*

Q: Uh-huh. Did you inform Mr. Jenkins as to why you were not coming back to work?

A: No, I was—the advice of my attorney was to not talk to him, call or have any conversation with him.

Q: Did you have your attorney tell Mr. Jenkins why you were not coming back to work?

A: I don't think he did.

Q: Well, whether you think he did or not, the question is, if you told him to do it. Did you tell him to do it?

A: No, I didn't tell him to do that, no . . . .

\* \* \* \* \* \*

Q: Okay, and until today, had you informed Mr. Jenkins that the reason you were not returning to work was because he didn't have Worker's Compenation [sic] coverage?

A: I hadn't informed him of that. No, on the advice of my attorney, I was not to have any conversation with him until today.

During the hearing, the Appeals Referee requested proof that the injury that Clark alleged he sustained was, in fact, work related. Clark was unable to provide such proof.

Rollie Jenkins, president of Eagle Mill, testified that the actual last day that Clark worked at Eagle Mill was November 25, 1991. According to Mr. Jenkins, Clark worked six hours that day and left in the afternoon for a doctor's appointment. The last contact he had with Clark was on November 29, 1991 when Clark came in to pick up his paycheck. At that time, Clark informed Mr. Jenkins that he was going to

---

**3.** As stated above, Eagle Mill and Elevator Company was incorporated effective October 30, 1991 and, thereafter, became known as Eagle Mill, Inc. Prior to incorporation, Eagle Mill and Elevator Company had only four employees and, thus, was not required to carry workers' compensation insurance. See § 287.030.1(3), RSMo Supp.1993. After incorporation, Eagle Mill had five employees (because Rollie Jenkins became an employee of the corporation) and thus was subject to the Workers' Compensation Law. Eagle Mill apparently tried to reduce the number of employees so that it would not be in violation of the Workers' Compensation Law for failing to carry workers' compensation insurance.

have the surgery immediately. Mr. Jenkins did not hear from Clark after that time. When asked at what point Clark stopped being an employee of Eagle Mill, Mr. Jenkins responded, "On January 31, his insurance premiums were discontinued, and I would assume at that time we would say that he was disqualified as an employee." Thereafter, the following colloquy occurred:

Q [Appeals Referee]: Mr. Jenkins, why did Mr. Clark's insurance premiums stop on January 31, 1992?

A [Mr. Jenkins]: After no contact with Mr. Clark and no way to contact him, it was felt that he had abandoned his job. A call was made to his physician's office to try to verify his condition and was informed was informed [sic] that due to patient confidentiality that Mr. Clark would have to make the contact and give the information.

\* \* \* \* \* \*

Q: ... Are there any other facts pertaining to Mr. Clark's separation from work that—

A: Well, Mr. Clark's return was anticipated because my busy season is from October through March, because I am a manufacturer of bird feed. After three weeks of not hearing from Mr. Clark, I did get a warehouse replacement, but Mr. Clark's duties far exceeded just the warehouse. He worked in the office. He answered phone calls, made phone calls. So there was light duty work there for him, and, specifically, after January 1, when my secretary goes to tax office until April 15. So there was light duty work available from January 1 until April 15, and I believe still to this day that Mr. Clark has the keys to the front door of Eagle Mill and also to the warehouse. So, I would have made an effort to get those back if I had not anticipated his return.

\* \* \* \* \* \*

Q: On Claimant's Exhibit 2, you state in answer to 29—ans—item number 29, that accident has never been reported to employer. What does that mean?

A: I was never notified that he had slipped on the ice and had hurt himself. ... So there was never any time that I insisted or in any way tried to see that he was injured, and the slipping on the ice, I am not aware of it. None of my employees are aware of it, and it's just alleged. I—I have no proof of it.

Clark, however, contends that he told Mr. Jenkins of his injury immediately after it happened.

The record reflects that Clark was not fired by his employer or in any way told not to return to work. Clark voluntarily decided not to return to work. The evidence further indicates that Clark made no effort to resolve the dispute before resorting to leaving his job. The evidence shows that Clark was physically able to return to work after his surgery and that there was light duty work available for him at Eagle Mill. Clark failed to communicate with his employer from November 29, 1991 through at least January 31, 1992 to advise of his intentions and/or his concerns, and evidently Eagle Mill could not get in touch with Clark.

Regardless of whether Eagle Mill was required to carry workers' compensation insurance, Clark did not act in good faith when he made no effort to communicate and to resolve his dispute with his employer and, thus, Clark has failed to prove that he left his employment with good cause. Clark's lack of communication and lack of effort to work out his dispute with Eagle Mill was unreasonable, and Eagle Mill was justified in assuming that Clark had abandoned his job.

The record indicates that Clark quit on his own volition before Eagle Mill could do anything, if, indeed, it was required to do anything, to address Clark's concerns. Therefore, Clark quit voluntarily without good cause attributable to his work or to his employer.

The Commission's finding that Clark voluntarily left his job without good cause attributable to his work or to his employer is supported by competent and substantial evidence.

Appellant's first point is denied.

█ In his second point on appeal, Clark argues that the Commission's findings are

erroneous and contrary to law and not supported by competent and substantial evidence because Clark did not voluntarily leave his job on January 31, 1992 (or any other relevant date), in that "the uncontroverted evidence established Eagle Mill had already replaced [Clark] within three weeks of November 29, 1991, and [Clark] was not released to return to work until February 2, 1992."

As discussed above under Point I, the evidence does not support Clark's contention. Rollie Jenkins made it clear that, even though they hired someone as a warehouse replacement, there was still light duty work available for Clark. Furthermore, Clark's health insurance premium was paid for through January 31, 1992, despite the fact that no one at Eagle Mill had heard from Clark since November 29, 1991, and Clark was considered an employee until January 31, 1992. The evidence supports the Commission's finding that Clark voluntarily left his job without good cause as of January 31, 1992.

The trial court's judgment is affirmed.

All concur.