Steve SOKOL, Appellant,

v.

**LABOR AND INDUSTRIAL RELATIONS COMMISSION OF MISSOURI, Missouri Department of Employment Security, Respondents,**

TAI Services, Inc., Defendant.

No. WD52145.

Missouri Court of Appeals, Western District.

June 3, 1997.

Steve Sokol, Overland Park, Appellant pro se.

Ronnae L. Coleman, Kansas City, for Respondent Missouri Division of Employment Sec.

Victorine Robben Mahon, Jefferson City, for Respondent Labor & Indus. Relations Com'n.

Before ELLIS, P.J., and LOWENSTEIN and LAURA DENVIR STITH, JJ.

LAURA DENVIR STITH, Judge.

Appellant Steve Sokol appeals the decision of the Labor and Industrial Relations Commission that he was not entitled to unemployment benefits because he left work voluntarily without good cause attributable to his employer. Because we find that Mr. Sokol did not leave his employment voluntarily, and further that, had he done so, it would have been for good cause, we reverse.

I. *Factual Background of Termination of Claimant*

Mr. Sokol was employed by respondent TAI Services, Inc. (TAI), a Georgia corporation. TAI's business principally involves eddy current testing of air conditioning equipment. TAI is based in Georgia, and operates in the Southeastern United States. It also, however, has customers in other parts of the country, including the Midwest. On October 10, 1988, TAI Services hired Mr. Sokol to run its Kansas City regional operations.

When hired, Mr. Sokol signed an employment contract which provided that either party could terminate his employment with or without cause upon 30 days written notice. It also provided that for two years after termination of his contract by either party for any reason, he could not "engage generally in direct competition with the Employer in the business of eddy current testing of tubes" and that this limitation would apply "within the existing marketing area of the Employer in the southeastern states of the United States or any future marketing area of the Employer began [sic] during employment under the terms of this Agreement."

Mr. Sokol continued in TAI's employ until he was terminated on July 15, 1994. The parties disagree as to whether Mr. Sokol was involuntarily discharged or whether he voluntarily left employment. Both agree, however, that he left employment because he refused to sign a revised employment contract.

It is undisputed that the revised contract was offered to Mr. Sokol on July 5, 1994. That morning, TAI President Ray Joseph called Mr. Sokol from Georgia. Mr. Joseph said he was flying into Kansas City and wanted to meet Mr. Sokol at the airport. Mr. Sokol later testified that when they met, Mr. Joseph demanded that Mr. Sokol immediately sign a new contract. Mr. Sokol objected that he did not understand the contract, but Mr. Joseph insisted that he would not leave until the document was signed and allegedly made numerous threats to Mr. Sokol. Mr. Joseph also allegedly told Mr. Sokol that the new contract had only minor changes from the old contract.

According to Mr. Sokol, he tired after three hours of wrangling and agreed to sign the new contract with a handwritten modification that it would be in effect for one year and would be renewed yearly thereafter unless written notice of termination was given within 30 days of the termination date.

The following day Mr. Sokol consulted with an attorney. He was told that some of the basic provisions of the contact were very one-sided, and further that some major changes had been made between the first and second contracts. A comparison of the two contracts reveals that most important among the changes were: (1) a requirement that Georgia law would apply; (2) an increase in the guaranteed base salary to an amount above that of the original contract but below that which Mr. Sokol was actually then earning; and (3) a complete revision to the non-competition clause.

Whereas the non-competition clause in the first contract had barred Mr. Sokol from competing with TAI only in the eddy current testing business and only in the Southeastern United States and in future marketing areas [1] for two years after termination, the new clause barred Mr. Sokol from competing throughout the United States, barred him from soliciting business from or contacting any TAI customer with whom he had worked, and applied to both eddy current testing and any other product, equipment or service sold, provided or under development by TAI, for 18 months after termination.

Believing that he had been lied to in an effort to coerce him into signing the new contract, Mr. Sokol sent a letter to Mr. Joseph on July 6, 1994, rescinding the new contract.[2] The letter stated:

> This letter is to notify you that the contract which I signed yesterday should be considered null and void.
>
> I feel I was coerced into signing the contract without the benefit of consulting with my lawyer or receiving any counsel . . .
>
> . . . Again, this letter should be considered a formal rescission of the above mentioned contract.
>
> I truly would like to work for TAI Services for many years to come and I hope this doesn't effect our working relationship. If you wish to discuss this matter further, please feel free to call.

On July 15, 1994, Mr. Joseph called Mr. Sokol and told him that he accepted the rescission letter. He then told Mr. Sokol to again sign the new contract. Mr. Sokol claims that when he refused, Mr. Joseph told him that he would take Mr. Sokol's July 6, 1994 letter as a letter of resignation. Mr. Sokol said that he was not resigning and that he wanted to continue to work for TAI. Mr. Joseph finally told him that he would have the weekend to reconsider and if he did not

---

1. Respondent does not claim that the portion of this clause barring competition in future marketing areas applied to Mr. Sokol. We therefore will not further address that aspect of the non-competition clause in the first agreement.

2. The dissent suggests that we have accepted Mr. Sokol's version of the facts rather than that of the Commission. The Commission did not anywhere suggest it disbelieved Mr. Sokol's chronology of events, however. It simply found that the changes in the contracts were so minor as to be of no legal significance. For the reasons set out below, we disagree on the legal effect of the facts, not the facts themselves.

sign by Monday then he would be terminated. On July 18, 1994, Mr. Sokol received a notice from TAI that he was terminated effective July 15, 1994. He received four weeks severance pay.

Mr. Sokol applied for unemployment benefits, claiming that he had been discharged without cause. His employer contested his claim, stating that he had been fired for refusing to sign the second contract, and that this was in effect a voluntary quit because the changed provisions were not unreasonable and thus Mr. Sokol had it within his power to remain employed just by signing the second contract.

## II. GOVERNING LAW AND STANDARD OF REVIEW

■ The burden is on the claimant to prove eligibility for benefits. *See Kansas City Club v. Labor & Indus. Relations Comm'n,* 840 S.W.2d 273, 275 (Mo.App.1992). In determining whether this burden has been met, we are guided by the public policy set out in Section 288.020. It states that we should liberally construe the provisions of that Chapter so as to achieve the purpose of promoting economic security for those unemployed through no fault of their own:

1. As a guide to the interpretation and application of this law, the public policy of this state is declared to be as follows: ... setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

2. This law shall be liberally construed to accomplish its purpose to promote employment security both by increasing opportunities for jobs through the maintenance of a system of public employment offices and by providing for the payment of compensation to individuals in respect to their unemployment.

§ 288.020. Under this standard, the provisions of § 288.040 governing eligibility for benefits are liberally construed to provide coverage.

■ The employer, TAI Services, has not contested Mr. Sokol's qualification for benefits under Section 288.040. Instead, it claims that Mr. Sokol is disqualified from receiving benefits for which he would otherwise be eligible by reason of Section 288.050. Section 288.050 provides reasons for disqualifying otherwise eligible individuals from receiving benefits. It states in relevant part that:

Notwithstanding the other provisions of this law, a claimant shall be disqualified ... if the deputy finds:

(1) That he has left his work voluntarily without good cause attributable to his work or to his employer; ...

§ 288.050.1. This and the other disqualifying provisions of Section 288.050 are strictly and narrowly construed in favor of finding that an employee is entitled to compensation. *Citizens Bank of Shelbyville v. Industrial Comm'n,* 428 S.W.2d 895, 898 (Mo.App.1968); *Kroger Co. v. Industrial Comm'n,* 314 S.W.2d 250, 254 (Mo.App.1958).[3] Nonetheless, where, as here, the employer claims that the employee voluntarily left his employment without good cause attributable to his employer, the employee has the burden of proving that this is not the case, either by showing that he left work for good cause attributable to his employer, or by showing that he did not voluntarily leave work but rather was discharged. *Id.*

The Commission found that Mr. Sokol did not meet his burden. In support, it stated that it believed that the new contract "was substantially and predominantly similar" to Mr. Sokol's original contract and that the changes to which Mr. Sokol objected were "minor changes to the contract [which] did not constitute a substantial change in wages or working conditions." It found that because the changes were minor and reasonable, it was unreasonable of Mr. Sokol to

---

3. We disagree with the dissent that there is a discrepancy between the statement in *Citizens Bank of Shelbyville* that the provisions of the employment security law will be liberally construed in favor of coverage and the statement in the same case that the disqualifying provisions will be strictly construed. To the contrary, the strict—that is, narrow—construction of exceptions or disqualifying provisions called for in that case, in reliance on *Kroger,* is fully consistent with a liberal interpretation of the law so as to effect entitlement to benefits. *See Kroger,* 314 S.W.2d at 254.

refuse to sign the new contract, and thus he should be considered to have voluntarily quit without good cause attributable to his work or to his employer. It thus disqualified him from benefits. Mr. Sokol appealed to the circuit court, which affirmed.

■ We review the determination of the Commission, not of the circuit court. *Charles v. Missouri Div. of Employment Sec.,* 750 S.W.2d 658, 661 (Mo.App.1988). We will affirm a factual determination by the Commission as to whether an employee voluntarily left his employ or was discharged if it is supported by competent and substantial evidence on the record as a whole. *Chilton v. Labor & Indus. Relations Comm'n,* 805 S.W.2d 722, 723 (Mo.App.1991). We will, however, engage in a *de novo* review of whether the facts found by the Commission can, as a matter of law, be considered to constitute a voluntary departure from employment. *Haynes v. Unemployment Compensation Comm'n,* 353 Mo. 540, 183 S.W.2d 77 (1944).

III. WHETHER THE CLAIMANT IS CONSIDERED TO HAVE VOLUNTARILY QUIT HIS EMPLOYMENT WITHOUT GOOD CAUSE ATTRIBUTABLE TO HIS EMPLOYER WHERE HE WAS TERMINATED FOR REFUSING TO SIGN A NEW CONTRACT

A. *Mr. Sokol did Not Voluntarily Leave Employment.*

■ We first address the issue whether the Commission erred in the first instance in holding that Mr. Sokol should be considered to have voluntarily left his employment where he was terminated for refusing to sign a new contract. He claims that he did not quit, but was fired after making clear to the employer that he wanted to continue his employment with TAI. The employer claims, to the contrary, that the Commission properly considered Mr. Sokol to have, in effect, voluntarily left his work in that it was within his power to continue working by signing the second contract offered to him by his employer.

We find the Commission's determination that Mr. Sokol's dismissal should be considered a voluntary quit because he could have signed the second contract offered by his employer is in conflict with the law as set out in *Von Hoffman Press, Inc. v. Industrial Comm'n,* 478 S.W.2d 403 (Mo.App.1972).

In *Von Hoffman Press,* the court discussed the same issue: whether a discharge for failure to agree to new terms of employment can be considered a voluntary quit. In that case, the claimant was employed part-time. Her employer offered her full-time employment with benefits, but at a lesser hourly wage. The claimant declined the offer, and the employer located and trained someone else for the full-time position. The employer then fired the claimant and the new full-time employee took over her old job.

The employer opposed the claimant's application for unemployment benefits on the basis that she in effect voluntarily left her work without good cause. It argued that because she was only discharged for refusing to accept the offered full-time employment, she thus had it within her power to continue working. The court rejected that argument, stating:

> Obviously, the plain meaning of the words used prevent us from construing this portion of the section to include a termination of employment by dismissal or discharge. Mrs. Lorenzen did not voluntarily quit her job at Von Hoffman Press. She wanted to continue, but only on a part-time basis. All through her testimony she characterized her termination of employment as a dismissal. She did not voluntarily sever her employment relations with Von Hoffman.

*Von Hoffman Press,* 478 S.W.2d at 404–05.

Other cases have also held that where the employer tells the employee to take a certain action or accept a certain situation or be fired, and the employee refuses to agree to what was asked by the employer and is fired, then the employee should be considered to have been discharged for cause rather than to have voluntarily left employment. For example, in *Francis Howell Sch. Dist. v. Labor & Indus. Relations Comm'n,* 687 S.W.2d 681 (Mo.App.1985), we held that em-

ployees fired for engaging in a wrongful strike may not have been entitled to benefits because their firing was justified by their illegal strike. We remanded the case for a finding on whether the employees were available for work. However, we decided that the employees did not quit, but were discharged. We found that the employees could not be considered to have quit their jobs just because they refused to return to work in protest of the firing of two fellow employees. We reasoned that the employer's ultimatum to return to work or be fired, combined with the fact that the employees picketed the employer, indicated that the employees were on strike, and not that they quit. Thus, we considered the employees discharged, and not as having quit.

We applied similar reasoning, but reached the opposite result in *Price v. Labor & Indus. Relations Comm'n*, 811 S.W.2d 457 (Mo. App.1991). In *Price*, a store manager with a new baby was fired after she refused to report to work for two evenings per week. We held that competent and substantial evidence supported the finding that the manager voluntarily quit her job. A preexisting store policy stated the evening work requirement, and the manager refused temporary alternative daytime employment at a lower paying job.

In *Francis Howell School* we relied on *Diversified Case Co., Inc.*, 263 N.L.R.B. No. 119, 111 LRRM (BNA) 1145 (1982), a case applying federal law. In *Diversified Case Co.*, two employees failed to return to work after lunch because they were dissatisfied with certain pay deductions and shop conditions. The workers told their employer of their intent not to return, and were warned that failure to return would end their jobs. When they failed to return to work until the next morning, the employer refused to allow them to work. The NLRB held that the workers were discharged. The fact that they came in the next day indicated that they did not intend to quit.

Similarly, in *Ridgeway Trucking Co.*, 243 N.L.R.B. 1048, 1049 n. 8 (1979), *enforced, NLRB v. Ridgeway Trucking Co.*, 622 F.2d 1222 (5th Cir.1980), an employer's telling recalcitrant employees to "work or leave" was held to be a discharge ultimatum. They were not considered to have quit, but to have been fired.

Here, Mr. Sokol was discharged for refusing to accept a new contract which, as discussed below, substantially changed his terms of employment. As in *Von Hoffman Press* and the other cited cases, Mr. Sokol did not voluntarily sever his employment relationship. Rather, he specifically refused to allow the employer to consider his refusal to sign the new contract as a resignation, stating that he wanted to continue employment under his initial contract. It was the employer who decided to terminate Mr. Sokol rather than have him continue to work under his existing contract.

■ This distinguishes this case from those cited by the employer in which an employee quit rather than accept reasonable changes in employment proposed by the employer and then argued that he or she had quit for good cause.[4] Here, the employee did not quit and had a right to continue employment under his first contract, which was still in effect because he rescinded the second contract.[5]

Of course, under the terms of the first contract, the employer could have given Mr. Sokol thirty days notice and terminated him

---

4. *See, e.g., Bank of Shelbyville*, 428 S.W.2d at 899; *Belle State Bank v. Industrial Comm'n*, 547 S.W.2d 841, 846–47 (Mo.App.1977); *Charles*, 750 S.W.2d at 659–61.

5. The evidence below was that the employer accepted Mr. Sokol's rescission letter of July 6, 1994, and told Mr. Sokol that it had been effective. He apparently did not raise any issues with Mr. Sokol as to whether he was entitled to rescind based on the facts he stated, but instead asked him to reconsider and then fired him for refusing to do so. We thus consider the second contract to have been rescinded. Where a contract is rescinded, it is void and of no effect. The parties are put back in the positions they held prior to the signature of the rescinded contract. *Ballenger v. Castle Rock Bldg. Corp.*, 904 S.W.2d 62, 64 (Mo.App.1995); *Haas v. Town & Country Mortgage Co.*, 886 S.W.2d 225, 228 (Mo.App. 1994); *Phillips v. Bradshaw*, 859 S.W.2d 232, 235 (Mo.App.1993). Here, that means that they were continuing to operate under the contract signed in 1988.

with or without cause at any time. If he had done so, however, Mr. Sokol would have been entitled to unemployment compensation benefits unless the employer met the burden of showing that the employee was dismissed for misconduct connected with his work. *See* § 288.040(2); *General Motors Corp. v. Labor & Indus. Relations Comm'n,* 653 S.W.2d 702, 703 (Mo.App.1983) (worker fired for fighting at work who showed that he acted in self-defense was entitled to benefits).

But TAI does not claim that Mr. Sokol was fired for misconduct connected with his work, and in any event TAI did not take the option of terminating Mr. Sokol's contract in accordance with its provisions. Mr. Joseph instead offered Mr. Sokol a new and substantially changed contract and ordered him to immediately sign it or be fired. This in itself violated the 30–day notice provision of Mr. Sokol's contract. Now the employer wants us to hold that it could not only violate Mr. Sokol's contract rights with impunity, but could also benefit from that violation by preventing Mr. Sokol from recovering unemployment benefits to which he would otherwise be entitled. We decline to adopt this approach.

For these reasons, we hold that the Commission erred in reaching the legal conclusion that Mr. Sokol voluntarily left his employment where he was terminated for refusing to sign a new contract. Under the law, this conduct did not constitute a voluntary quit; to the contrary, Mr. Sokol was discharged.[6]

B. *The Contract Changes Were Substantial and Constituted Good Cause for Mr. Sokol to Leave His Employment*

The dissent indicates that he believes that Mr. Sokol should be considered to have been discharged rather than to have voluntarily quit because he had it within his power to sign the new contract offered to him by his employer. It therefore goes on to address the issue whether Mr. Sokol quit for good cause attributable to his employer, and concurs with the Commission's determination that the addition of a non-competition clause in the circumstances of this case does not constitute good cause.

■ We disagree. We hold that, even if Mr. Sokol were considered to have voluntarily quit, he had good cause to do so in that the changes in the contract were substantial and were pushed on him in a manner which violated his prior contract. We disagree with the Commission's determination that the reasons Mr. Sokol did not sign the second contract—such as dissatisfaction with the revised non-competition agreement and with other contract provisions—did not constitute substantial changes in his employment and thus did not constitute good cause to quit attributable to his employer.

 Whether Mr. Sokol's reason for leaving his employment constituted "good cause" is a legal issue on which we do not defer to the Commission's determination below. *Heavy Duty Trux v. Labor & Industrial Relations Comm'n,* 880 S.W.2d 637, 641 (Mo.App.1994). The phrase "good cause" has no fixed or precise meaning, and is judged by the facts of each case. *Belle State Bank v. Industrial Comm'n,* 547 S.W.2d 841, 846 (Mo.App.1977). The standards by which good cause is judged can be summarized, however, as an objective determination of what a reasonable person would do in the same or similar circumstances. In this regard, we have previously stated that:

> the circumstances motivating an employee to terminate employment must be "real not imaginary, substantial not trifling, and reasonable not whimsical and *good faith* is an essential element." *Belle State Bank v. Industrial Commission,* 547 S.W.2d 841, 846 (Mo.App.1977). Good cause is limited to instances where the unemployment is caused by external pressures so compelling that a reasonably prudent person would be justified in terminating employment.

*Charles,* 750 S.W.2d at 661. *Charles* further explains that absent "discriminatory or

---

**6.** The dissent suggests that we are second guessing the Commission on an issue of fact by so holding. We disagree. We accept the facts found by the Commission, but hold that as a matter of law they do not constitute a voluntary quit. Rather, they constitute a discharge. As in *Von Hoffman Press* and *Francis Howell School District, supra,* this is a proper issue for determination by this court on appeal.

unfair or arbitrary treatment, mere dissatisfaction with working conditions does not constitute good cause for quitting employment unless the dissatisfaction is based upon a substantial change in wages or working conditions from those in force at the time the claimant's employment commenced." *Id.*

The rule that one is justified in quitting in the face of arbitrary or unfair treatment was applied in *Heavy Duty Trux,* 880 S.W.2d at 644. In that case an employee accidentally caused his truck to go into a ditch. He received oral permission to have the truck towed out of the ditch, and the employer never conducted any investigation to determine whether the accident was caused by the employee. Instead, the employer simply charged the driver the substantial cost of the towing. The employee objected to this treatment and quit. The employer said that it was a voluntary quit and opposed the worker's application for unemployment compensation. *Heavy Duty Trux* concluded that the arbitrary and unfair approach taken by the employer provided good cause for the driver's decision to quit, and found the driver qualified for unemployment.

Here, as in *Heavy Duty Trux,* we find that the employer engaged in arbitrary and unfair treatment of Mr. Sokol. The employer failed to comply with the contract provision requiring thirty days notice of termination by insisting that Mr. Sokol sign the new contract immediately without advice of counsel. This is just the type of arbitrary behavior which we believe justifies a voluntary quit.

In addition, we believe that Mr. Sokol had good cause for quitting because he faced the very type of situation described in the quotation from *Charles* above, a "substantial change in wages or working conditions from those in force at the time the claimant's employment commenced." *Id.*

First, we note that the second contract required the application of the law of Georgia, where TAI was incorporated. The rights of employees vary greatly from state to state. While Mr. Sokol does not rely on this change on appeal, we believe that as an objective matter an agreement to change the applicable law is at least an important change in the contract which can be considered in combination with other changes in determining whether the new contract provided good cause to refuse to sign the new contract.

Most important of those other changes was the change in the non-competition clause. The Appendix to this opinion contains a side-by side comparison of the clauses. It reveals that one provision of the proposed new clause was beneficial to Mr. Sokol—the non-competition period was shortened from two years to 18 months. The remainder of the changes in this clause were far from beneficial to Mr. Sokol, however.

The non-competition clause in the first contract just limited Mr. Sokol in the Southeastern United States, and did so only in the field of eddy current testing. As Mr. Sokol did not work in the Southeastern United States, this clause really did not affect him negatively. Even if he quit or were fired, it would not affect his future employment or ability to undertake his line of work. The non-competition clause was basically of no practical effect.

The dissent argues, and the Commission found, that the new contract simply "updated" the non-competition clause with "minor" changes. We agree with Mr. Sokol, however, that the changes were far from minor. The non-competition clause in the revised contract was much broader in scope and far more onerous in potential application. While it prohibited competition for only 18 months, it did so throughout the United States and in every field in which TAI might offer products, equipment or services, and applied to all of the customers that Mr. Sokol had worked with in the prior six years. It thus barred Mr. Sokol from undertaking his current work or even related work with any of the persons with whom he had built up contact. As a result, the new contract effectively barred Mr. Sokol from employment in his chosen field anywhere in the United States for 18 months, while the former contract had barred him from employment in that field only in a part of the country in which he was not working.

In this situation we think the analysis of *Ryan v. Employment Div.,* 87 Or.App. 471,

742 P.2d 707 (1987), is applicable. Mr. Ryan was operations director of his employer's racquetball club. His contract was oral. Six weeks after he began work the method of compensation was changed, and a few weeks thereafter he was asked to sign a written contract which contained a non-competition clause which barred him from being connected "in any manner with any business of the type conducted by the employer within a 50–mile radius of employer's business." *Id.* at 708. When Mr. Ryan objected, his employer told him that if he refused to sign he would be fired. Mr. Ryan said "Do you want me to leave right now?" His employer answered "Okay," and Mr. Ryan left the premises after gathering his personal effects.

The employer opposed Mr. Ryan's claim for unemployment benefits by claiming that Mr. Ryan had voluntarily left his employment without good cause. The appeals board agreed and denied compensation. The court of appeals reversed, finding that Mr. Ryan had good cause to leave work. In so doing, it applied a definition of good cause which is not unlike that in Missouri, stating that good cause is cause:

> such that a reasonable and prudent person of normal sensitivity, exercising ordinary common sense would leave work. The reason must be of such gravity that the individual has no reasonable alternative but to leave work.

*Id.* at 709. The court of appeals found that the employer's attempt to require Mr. Ryan to sign a non-competition clause provided good cause for him to refuse to sign the new contract, stating:

> *[t]he imposition of the noncompetition clause was a matter of such gravity that claimant had no reasonable alternative but to leave work.* We do not agree with the referee's conclusion that the alternatives of signing the contract and latter challenging it or negotiating a more limited geographical area of coverage of the clause were reasonable. We hold that EAB's findings and reasoning did not support the

conclusion that claimant left work without "good cause."

*Id.* (emphasis added).[7]

Here, as in *Ryan,* we find that the imposition of the non-competition clause was a matter of such gravity that Mr. Sokol could have determined in good faith that he had no reasonable alternative but to leave work. If he did not sign the second contract and then left work, he could still work in his chosen field. If he did sign the second contract, he could not do so.

Indeed, for all TAI's claims that the change in the contract was minor, it fired Mr. Sokol for refusing to sign it, brought suit to enforce it, and was actually permitted to enforce it against Mr. Sokol despite the fact that the second contract was rescinded before Mr. Sokol was discharged. Mr. Sokol was out of work for 18 months. The new non-competition clause barred Mr. Sokol from engaging in the business for which he was trained. It is hard to conceive of a more critical or substantial change in the terms of employment to which Mr. Sokol was subject. On these facts, we simply disagree with the dissent and with the Commission below that the change was minor and did not constitute "a substantial change in wages or working conditions from those in force at the time the claimant's employment commenced." *Charles,* 750 S.W.2d at 661.

For these reasons we reverse the decision of the Commission and remand for a determination of Mr. Sokol's unemployment benefits in accordance with this opinion.

ELLIS, J., concurs in this opinion.

LOWENSTEIN, J., dissents in separate dissenting opinion filed.

LOWENSTEIN, Judge, dissenting.

Bad facts in a case can lead an appellate court to strain to attempt to do what it feels to be "the right thing." The fact that the employer's conduct here was shabby in its method of changing the contract with Sokol, does not change or negate eligibility require-

---

**7.** The court stated that because it found that Mr. Ryan had not left without good cause, it did not need to address claimant's alternative argument that he did not leave work voluntarily when he was fired for refusing to sign the proposed contract.

ments of a worker under Missouri's unemployment compensation law so as to bestow benefits in this case. For all the rhetoric and logic put forth either in the court's opinion, or in this dissent, this case will now be the common law in Missouri, and will stand for the following proposition: an employment contract, terminable by either party on 30 days notice, if modified by the employer, *only* as to, 1) the non-compete clause by broadening the area limitation to reflect current area limitations and reducing the time limitation, 2) reflecting increased current compensation; and 3) adding language that the law governing the contract will be that of the state of situs of the employer's home office, will all be sufficient to allow an employee to reject those terms and to then collect unemployment benefits. Such a result goes against the purpose of and reason for this law.

The effort to help the claimant receive benefits has resulted in the following:

1) It has caused the scope of review to be mentioned and then ignored. In the interest of brevity a few examples are noted. The question of termination versus quit (pages 7—12 of the majority) is a *fact* question for the Commission, and the courts *are not* at liberty to over turn the determination of the Commission of a voluntary quit by Sokol. Whether the employee voluntarily quit, as opposed to being terminated, is a matter of fact to be determined by the Commission. If there is competent and substantial evidence to support a finding of a quit, or resignation by the employee's actions, the Commission's finding is binding on the court. *Allen v. Green Ridge R–VIII Sch. Dist.*, 892 S.W.2d 635, 637 (Mo.App.1994); *Chilton v. Labor & Industrial Relations Comm'n*, 805 S.W.2d 722, 723 (Mo.App.1991). In addition, and by way of example, on page 2 of the facts, the majority's conclusion that "[M]r. Sokol continued in TAI's employ until he was *terminated* ..." (emphasis added), makes a 180○ turn via a leap over the Commission's express findings of a *quit*. Although judges may not have found a quit as did the Commission, nevertheless, the Commission's finding was supported by competent and substantial evidence and may not

be now ignored or altered. *Campbell v. Labor and Industrial Relations Commission*, 907 S.W.2d 246—249 (Mo.App.1995).

2) It has caused this court to discount and ignore the facts as found by the Commission on the issues presented to it, and take as gospel such statements of appellant as, "they lied to me." There is nothing in the transcript to back up Sokol's conclusions, and should not now be considered here. *Crestwood Commons Redevelopment Corp. v. 66 Drive–In*, 812 S.W.2d 903, 909 (Mo.App. 1991); *Woodard v. Director of Revenue*, 876 S.W.2d 810, 816 (Mo.App.1994).

No matter how the majority attempts to interpret (at page ——) the Commission's failure to include as a finding that Sokol had somehow been "lied to" as a justification that this court could now on appeal, make such a finding of fact, it simply remains and results in this court's making findings not in the record and not made by the fact-finder.

The findings of the Commission are printed in the Appendix to this Dissent. Also shown in the Appendix are the pertinent provisions of both the first and second contracts on non-competition.

3) The court has seized upon the additional language that Georgia law shall govern the contract as another reason for the reversal. It was simply never in the record what effect, *if any*, this provision would have. Sokol has not, other than pointing to the addition of this provision, made any mention, nor cited any authority regarding how this provision impacted his employment. It is not the duty of a court to search for error nor to raise matters not presented or argued by an appellant *School Dist. of Springfield v. Transamerica Ins. Co.*, 633 S.W.2d 238, 253 (Mo. App.1982); *Morovitz v. Morovitz*, 693 S.W.2d 189, 191 (Mo.App.1985); *Brown v. Michigan Millers Mut. Ins., Co.*, 665 S.W.2d 630, 632 (Mo.App.1983). Also on page 2 of the facts, the majority recognizes the salary increase included in the second contract but says it was, "... below that which Mr. Sokol was actually earning." This reflects on an unproven fact which was not found by the Commission and not addressed prior to this court's opinion. Neither Sokol's salary nor his commissions were at issue at the hearing.

The sole issue both at the hearing and presented on appeal is the effect of the non-competition clause. What is inescapable is the fact the second contract, rescinded by Sokol, calls for a salary of $23,922 based on his testimony of a salary of $24,000, while the first contract has a figure of $14,400.

4) It has caused the court to lose sight of the fact that claims here are claims against a state fund. This is not a suit versus an employer, so repeated references in the majority opinion that "the employer wants us to hold that it could not only violate Mr. Sokol's contract rights with impunity ...," though seized upon by the court to justify a reversal, are not relevant. The following language from *Haynes v. Unemployment Compensation Comm'n.,* 353 Mo. 540, 183 S.W.2d 77, 80 (1944) a case cited by the majority as part of the scope of review is apropos.

> While it has been said that the "unemployment compensation laws are not necessarily designed for the adjustment of rights between employees and employers in the sense that they are adversary litigants," *S.S. Kresge Co. v. Unemployment Compensation Comm'n.,* 349 Mo. 590, 162 S.W.2d 838, 841 (1942), we think it is apparent that the burden of proof to establish a claimant's right to benefits under the Unemployment Compensation Law rests upon the claimant. *Queener v. Magnet Mills, Inc.,* 179 Tenn. 416, 167 S.W.2d 1 (1942). An unemployed individual is eligible to receive benefits only if the commission finds that the required conditions have been met. The claimant assumes the risk of non-persuasion and we think the general rule applicable to ordinary court proceedings applies.

As a postscript, the Court in *Haynes* considered only the issue of whether an employee had made herself available for work after she quit for health reasons. Most importantly here, *Haynes* reversed a circuit court's legal conclusions based on facts found by the Commission somewhat in line with paragraph above.

5) The court's result is based on contract law principles. This is not a contract case. While I do not condone the lack of 30 days notice called for in the first contract, the lack of notice doesn't seep into an unemployment compensation case under these facts, any more than an evaluation under contract law of the effect of Sokol's rescission. The focus here is whether Sokol may collect unemployment benefits against and out of a state fund which is to be a safety net for workers unemployed through no fault of their own, for the changes made in the contract of employment and his working conditions.

The second matter, also a contract law question, concerns TAI's separate circuit court suit that resulted in the employer's being able to enforce the second contract's noncompete clause nationwide, but particularly in the states of Missouri, Kansas, Nebraska and Iowa. Sokol was represented by counsel in that case. He did not appeal that judgment, so he is barred to compete for TAI customers for eighteen months, while under this action, he is unable to collect benefits. I am not unsympathetic to the anomaly created, but this appeal is solely for unemployment benefits, and the other two matters are strictly in contract and cannot alter or divert the inquiry of this case: Did Sokol have good cause to reject the second contract? As the Supreme Court points out in *Kresge* and *Haynes,* this action is for unemployment benefits under the applicable law of Chapter 228, and not for an adjudication of all matters between the parties.

The controlling statute here is § 288.050.1(1) which disqualifies a claimant from benefits if the deputy finds "... he has left his work voluntarily without good cause attributable to his work or his employer ..." The determination of a voluntary quit is one of fact for the Commission, and will be affirmed if supported by competent and substantial evidence. *Price v. Labor & Industrial Relations Comm'n.,* 811 S.W.2d 457, 459 (Mo.App.1991); *Schomaker v. Labor & Industrial Relations Com. of Missouri,* 675 S.W.2d 450, 451 (Mo.App.1984). Despite all the efforts of the majority at page 12, to the contrary, this court is stuck with case law firmly holding the issue of termination versus quit is a *fact* question to be reviewed as such by this court. Our attempts to do otherwise constitute a departure from the common law of this state.

Once a determination is made the leave is voluntary, it is then necessary to determine if it was for "good cause." *Allen,* 892 S.W.2d at 637. The burden of proof is on the claimant to establish the right to benefits. *Producers Produce, Co. v. Industrial Com. of Missouri,* 365 Mo. 996, 291 S.W.2d 166, 173 (1956). The claimant has the burden to prove "good cause," which is reviewed as question of law. *Heavy Duty Trux v. Labor and Industrial Relations Comm'n.,* 880 S.W.2d 637, 641 (Mo.App.1994). *St. John's Regional Medical Center v. Labor and Industrial Relations Comm'n,* 814 S.W.2d 698, 699 (Mo.App.1991).

"Good cause," is what would motivate an average worker in a similar situation, with known wages, working conditions, etc., to enter the ranks of the unemployed. *Belle State Bank v. Industrial Comm'n.,* 547 S.W.2d 841, 846 (Mo.App.1977). The circumstances motivating termination must be real, substantial, reasonable and in good faith, and result from external pressures so compelling a reasonably prudent person would give up the employment. *Clark v. Labor & Industrial Relations Comm'n,* 875 S.W.2d 624, 627 (Mo.App.1994). Good cause must emanate from the work itself or from the employer, as opposed to the employee. *Chilton,* 805 S.W.2d at 723. The good cause requirement shows the legislative intent of Chapter 288 to create an incentive for employed persons to remain employed by withholding benefits to those who quit without good cause. *Hessler v. Labor and Industrial Relations Comm'n.,* 851 S.W.2d 516, 518 (Mo.1993).

There appears to be a discrepancy in the cases as to the review of the disqualifying provisions such as § 288.050.1. The majority points to *Citizens Bank of Shelbyville v. Industrial Comm'n,* 428 S.W.2d 895, 898 (Mo.App.1968); *Kroger Co. v. Industrial Comm'n,* 314 S.W.2d 250, 254 (Mo.App.1958) for a construction in favor of entitlement. On the other hand, even though there is to be a liberal construction of the law, the disqualifying provisions in § 288.050 "must be strictly construed." *Citizens Bank of Shelbyville,* 428 S.W.2d at 897—98.

With the sole issue of whether the changes in the contract were of such a nature that Sokol could, without disqualification of Unemployment benefits, refuse to abide by the changes proposed by his employer, several cases need be examined. As the Eastern District said in *Citizens Bank of Shelbyville* 428 S.W.2d at 899, "We must interpret the words 'good cause' by their plain and rational meaning in the light of the purpose of the Employment Security Law.... [G]ood cause for voluntary unemployment is caused by external pressures so compelling that a reasonably prudent person would be justified in giving up employment." The words "good cause" have no fixed meaning and are read in light of the unique facts of each case. *Belle State Bank,* 547 S.W.2d at 846. The employee in *Citizens Bank of Shelbyville* quit because her supervisor gave her the "cold treatment," and "she didn't speak to me ... unless she had to." The court held a lack of cordiality did not amount to an external pressure so compelling to justify a prudent person in giving up her employment, and did not give her good cause for a quit. *Citizens Bank of Shelbyville,* 428 S.W.2d at 901.

Most common factors causing the employee to quit involve pay reduction, substantial changes in either working conditions or other terms of the employment.

Here are some factual examples of cases delineating good cause:

### CHANGES IN WORKING CONDITIONS

*S.S. Kresge Co.,* 162 S.W.2d at 841 held there is no provision in the law to plant a ruling that the former work or the new work is more suitable, and each case rests on its own merits. The opinion tells the Unemployment laws "are not necessarily designed for the adjustment of rights between employees and employers in the sense that they are adversary litigants ...," but contemplates the settling of issues under the stated public policy of providing reserves to benefit persons unemployed through no fault of their own.

*Allen,* 892 S.W.2d at 636, was a claim by a para-professional to help a blind student in the employer school district. The student moved to a neighboring school district some eleven miles away and the employer

assigned Allen to the new district. After a few months Allen decided not to work in the new district and wanted another job in the defendant district. This was denied. This court held Allen's objection to the extra travel time, "without further explanation as to why this imposes a hardship, does not represent a 'compelling' external pressure." *Id.* at 638.

In *Bank of Shelbyville*, 428 S.W.2d at 899, the opinion contains a compendium of out-of-state cases revolving around workplace conditions and what constitutes good cause, and holds that a person who quit when her supervisor failed to speak to her, or would "snap her off" was "not enough," to constitute "external pressure so compelling that a reasonably prudent person would be justified in giving up employment." *Id.* 900–01.

In a management reorganization the claimant's responsibilities were divided, a salary cut and job title changed. Under a statute that required a substantial change in working conditions that were less favorable to the employee, the court held the employee was entitled to benefits. *Musgrave v. Eben Ezer Lutheran Institute*, 731 P.2d 142, 143–44 (Colo.App.1986).

### Changes In Terms Of Employment

In *Belle State Bank*, the court said good cause means, "a cause reasonably sufficient to justify an employee in voluntarily leaving the ranks of the employed and joining the ranks of the unemployed" *Belle State Bank*, 547 S.W.2d at 846. Otherwise, said the court, if every reason which appeals to the claimant's head or heart counted as good cause, then the law would fail in its stated purpose. Applying the standard of reasonableness to the facts that the employer changed the dates of payment, minor changes in working hours, and minimal changes in sick leave benefits, the court said such changes had only a limited and relatively minor economic impact on the claimant and did not amount to good cause. *Id.* at 847.

The employee in *Charles v. Missouri Div. of Employment Sec.*, 750 S.W.2d 658, 659–661 (Mo.App.1988) left a job expecting to make more with her new employer. She resigned. This court held the employee's expectations were not those as outlined by the employer, so mere dissatisfaction with working conditions does not constitute good cause unless it is based on a substantial change in wages or working conditions "from those in force at the time the claimant's employment commenced."

Good cause was found in *Heavy Duty Trux*, 880 S.W.2d at 644 where the employer docked the pay of the driver for the tow, when the truck slid into a ditch during an ice storm. The quit was determined to be for good cause since the quit "was in response to appellant's unreasonable actions; i.e., determining that claimant was negligent without any investigation of the incident. . . ."

*Olson v. Employment Appeal Board*, 460 N.W.2d 865, 867–68 (Iowa App.1990), presented the court with an employee who had his hours reduced, pay cut, and was employed for seven months in the lesser job before the quit. The court held the changes were substantial, but the claim was disallowed because the employee had accepted the changes and worked for seven months, so a dissatisfaction with conditions did not constitute good cause.

The Supreme Court of Utah in *Larry Munger Enterprises, Inc. v. Industrial Comm'n. of Utah, Department of Employment Security*, 716 P.2d 808, 809 (Utah 1986), was faced with an over-the-road trucker who abandoned his rig after being tendered "a lengthy proposed contract of employment" containing what the employee thought were "unfair and possibly even illegal terms." Those terms were on employee liability, bonding requirements, pay advances and cost reimbursement policies, and work quotas and standards. The employee was told to sign the contract without modification. The Utah Board found some of the contract provisions were unreasonable and indeed unlawful and constituted conditions caused by external pressures so compelling a reasonable person would be justified in the quit. *Id.* at 810. The Supreme Court affirmed.

*In re Claim of Aquilina v. New York Telephone Company,* 62 A.D.2d 1096, 404 N.Y.S.2d 424 (1978) presented the question of a hire of a temporary employee for six months, who after the temporary period might or might not have been offered permanent employment with fringe benefits. The employer did not make a permanent hire after six months, but allowed the employee to stay on. The employee quit because she could not get the fringe benefits. The court denied benefits since good cause did not exist because the employee suffered no economic loss. The court referred back to the purpose of the law was to ease the hardship of involuntary employment "due to economic conditions or other conditions beyond the control of the employee". *Id.* at 425.

### Pay Reduction

A forty-four percent pay reduction due to an announced demotion to a lesser job constitutes good cause under the "accepted rule" that a substantial reduction in wages does indeed constitute good cause. *Armco Steel Corp. v. Labor and Industrial Relations Comm'n, Div. of Employment Sec.,* 553 S.W.2d 506, 508 (Mo.App. 1977). A substantial reduction of earnings ($165 down to $130) due to loss of guaranteed overtime constitutes good cause. *Tombigbee Lightweight Aggregate Corp. v. Roberts,* 351 So.2d 1388, 1390 (Ala.App. 1977). *Delaney v. Unemployment Compensation Board of Review,* 133 Pa. Cmwlth. 107, 574 A.2d 1198, 1199–1201 (1990), involved an investment broker who, for a period of months continued to negotiate an employment contract, but refused to sign a final offer of the same salary with substantial yearly increases and benefit package, with rights to accrue commissions and equity over what he was making. The new contract reduced his commissions on certain transactions. The court affirmed the denial of his claim for benefits under the statute saying "[C]laimants who, while employed, refuse to accept an offer of continued employment are deemed to have quit their position ...," and in order to gain benefits must show the voluntary quit was of a "necessitous and compelling

nature." *Id.* at 1200 and 1201. The court said there was "no talismanic percentage figure" that defines a substantial reduction in pay, but the fact the claimant was offered in the proposed contract of continued employment, substantial gains in other areas, as a matter of law, supported a denial. *Id.* at 1201.

In *Brewster v. Rutledge,* 176 W.Va. 265, 342 S.E.2d 232, 233 (1986), a night watchman's pay was reduced from $3.25 an hour to $2.25, and he was given extra duties as a janitor. The court held these unilateral changes were substantial and constituted good cause and benefits were allowed.

None of the facts on compulsion to give up the job and collect benefits under Chapter 288 are present. Sokol suffered no loss of wages, no undue burden of added duties, nor any change in his working conditions. The vast majority of the new contract was the same as the 1988 contract of hire.

The relatively simple explanation for the result in this unemployment compensation claim is this: the employee had no practical or legal right to have the 1988 contract of employment remain unchanged forever, the changes proposed by the employer were not so substantial and harmful to the employee so he should have given up the employment and become eligible for unemployment benefits.

The *Ryan* case from Oregon relied on by the majority should not be used to supply good cause under Missouri law. In *Ryan* the situation changed from the employee having a no compete clause in his contract as a health club manager, to the employer including one. In fact, and even more glaring, *Ryan* went from an oral to a written agreement and his compensation was changed (presumably downward). In the case at bar, Sokol's remuneration was increased, the noncompete clause was changed to reflect his current conditions. Here, rather than packing belongings and leaving as a victim as in *Ryan,* Sokol negotiated changes in other parts of the contract, signed it, and then later had second thoughts and cancelled. Here, as can be seen in the contracts in the Appendix, an employer dealing in sophisticated heating,

ventilating and air conditioning equipment products and their testing, sought to update a previous agreement with one of its salesmen, so he couldn't use its products and techniques with its customers after he left.

The only other avenue for Sokol's recovery would be to utilize the theory of "constructive discharge" as set out in *Div. of Employment Sec. v. Labor and Industrial Relations Commission of Missouri*, 739 S.W.2d 747, 748–49 (Mo.App.1987), but the facts here do not justify such a finding.

I cannot abide by the conclusion that the change in a *non-competition clause* constitutes, without any other factors, a substantial change allowing this claimant to collect from the fund. "An appellate court should not become an advocate for one of the parties in an effort to see if it can find a theory for reversal." *Stroup v. Facet Automotive Filter Co.*, 919 S.W.2d 273, 277 (Mo.App.1996).

I would deny the other two points raised by Sokol and would affirm the judgment affirming the Commission.

Contrary to *Allen*, 892 S.W.2d at 635, *Chilton*, 805 S.W.2d at 722 and *Campbell v. Labor and Industrial Relations Commission*, 907 S.W.2d 246, 249 (Mo.App.1995), which hold that the determination and review of the Commission's finding of a resignation to be a finding of fact, the majority opinion in this case treats and reviews this determination as a matter of law.

### APPENDIX

#### 1988 Contract Provision

In consideration of the Employer employing the Employee in a position wherein he will gain specialized knowledge and experience and will establish personal relationships with the Employer's customers, suppliers, and other employees, the Employee covenants and agrees as follows:

On termination of his employment whether by termination of this Agreement, by wrongful discharge, or otherwise, the Employee shall not directly or indirectly within the existing marketing area of the Employer in the southeastern states of the United States or any future marketing area of the Employer began during employment under the terms of this Agreement, enter into or engage generally in direct competition with the Employer in the business of eddy current testing of tubes either as an individual on his own or as a partner or joint venturer, or as an employee or agent for any person, or as an officer, director, or shareholder, or otherwise for a period of two years after the date of termination of his employment hereunder. This covenant on the part of the Employee shall be construed as an agreement independent of any other provision of this Agreement; and the existence of any claim or cause of action of the Employee against the Employer whether predicated on this agreement or otherwise shall not constitute a defense to the enforcement by the Employer of this covenant. In the event of a breach or threatened breach by the Employee of his obligations under this restrictive covenant, the Employee acknowledges that the Employer will not have any adequate remedy at law and shall be entitled to such equitable and injunctive relief as may be available to restrain the Employee from the violation of the provisions hereof. Nothing herein shall be construed as prohibiting the Employer from pursuing any other remedies available for such breach or threatened breach, including the recovery of damages from the Employee.

#### July 1994 Provision

In consideration of the Employer employing the Employee in a position wherein he will gain specialized knowledge and experience and will establish personal relationships with the Employer's customers, suppliers and other employees, the Employee covenants and agrees as follows:

Employee agrees that during the term of this Agreement and for a period of eighteen months immediately following cessation for any reason of Employee's employment with TAI SERVICES, INC., Employee shall not, on Employee's own behalf or on behalf of any person, firm, partnership, association, corporation or business organization, entity or enterprise, solicit, contact, call upon, communicate with, or attempt to communicate with any current customer of TAI SERVICES,

INC., with a view to the sale or providing of any product, equipment or service competitive or potentially competitive with any product, equipment or service sold or then being provided or under development by TAI SERVICES, INC., provided that the restrictions set forth in this section shall apply to customers of TAI SERVICES, INC., or representatives of customers of TAI SERVICES, INC. with Employee had contact during his employment with TAI SERVICES, INC. The actions prohibited by this section shall not be engaged in by Employee directly or indirectly, whether as a manager, salesman, agent, sales or service representative, engineer, technician or otherwise. It is expressly understood that the restrictions imposed hereby will survive the termination of this agreement for a period of 18 calendar months.

### State of Missouri
### DIVISION OF EMPLOYMENT SECURITY

### Jefferson City

FINDINGS OF FACT:

The claimant worked for the employer for nearly six years as an analyst, last working on July 15, 1994. The claimant was hired under the terms of a written employment contract which was in effect from his date of hire until July 5, 1994. The employer decided to implement minor changes in such contract in order to properly update same, notifying the claimant of its decision on July 5, 1994, and requiring the claimant to sign the new contract in order to continue his employment. The claimant signed the contract on July 5 after having negotiated a minor change which was handwritten at the end of the contract and signed by both parties. The next day the claimant faxed a letter to the employer notifying the employer of the claimant's intent to void the contract he signed the previous day, claiming he was coerced into signing the contract without the benefit of legal counsel and that he did not understand the contract or its implications, expressing a desire to continue working for the employer. After mailing the claimant a copy of the signed contract and permitting

him sufficient time to evaluate its contents, the employer contacted the claimant on July 15 to discuss the matter. The claimant refused to sign the contract based upon advice of counsel, believing the contract was unfair and unreasonable, referring to three specific provisions of the contract at the hearing. The evidence indicated those three provisions were substantially, if not exactly, the same as was included in the original contract of hire. The claimant could have continued in his employment had he signed the contract as required. The employer notified the claimant on July 15 that his refusal to sign the written employment contract would be considered as a termination of the employment relationship, providing the claimant with three days to reconsider his decision. The claimant's continued refusal to sign a contract resulted in his termination of employment. The employer considered the claimant's letter of July 6 to constitute notice of the claimant's intent to terminate the contract he signed on July 5, consistent with the provision in such contract permitting either party to terminate same upon thirty days advanced written notice to the other.